James A. **WEST** and James A. West, Jr., Appellants,

v.

**HAMPTON TOWNSHIP SANITARY AUTHORITY and The Township of Hampton**

James A. **WEST** and James A. West, Jr.,

v.

**HAMPTON TOWNSHIP SANITARY AUTHORITY and The Township of Hampton**

**Township of Hampton, Appellant.**

Commonwealth Court of Pennsylvania.

Argued March 14, 1995.

Decided June 28, 1995.

Reargument Denied Aug. 11, 1995.

---

Robert G. Del Greco, Jr., for appellants/appellees James A. West and James W. West, Jr.

Thomas H. Ayoob, III, for appellant/appellee Tp. of Hampton.

Alvin E. Dillman, Jr., for appellee Hampton Tp. Sanitary Authority.

Before DOYLE and NEWMAN, JJ., and RODGERS, Senior Judge.

NEWMAN, Judge.

James A. West and James A. West, Jr. (the Wests) appeal from an order of the Court of Common Pleas of Allegheny County (trial court) finding in favor of the Township of Hampton (Township) and the Hampton Township Sanitary Authority (Authority) in a declaratory judgment action involving the Authority's setting of certain water and sewage charges. The Township has filed a cross-appeal seeking an award of attorney's fees against the Wests.

## I. *FACTS*

In late 1990, the Wests obtained zoning approval from the Township to build a multi-family apartment complex on a commercial plot that they had begun to develop in 1985. When finished, the multi-family apartment complex was to contain 352 apartments of which sixty percent were to be two bedroom apartments, twelve percent were to be three bedroom apartments, and twenty-eight percent were to be one-bedroom apartments. As part of the development process, the Wests had to apply to the Authority for sewage and water connections.[1] However, before the Wests' actual application to the

---

1. These connections consist of three separate charges levied by the Authority: connection fees, tapping fees, and customer facilities fees. Only the first two fees are at issue in this appeal.

Authority was accomplished, the Authority recalculated its tapping and connection fees.

## A. TAPPING FEE

On June 12, 1991, the Authority adopted Resolution Nos. 79 and 80. These resolutions resulted in a new tapping fee of $3,400.00 per equivalent dwelling unit (EDU). The Authority's tapping fee was predicated upon a study performed by Mr. L. Burton Curry.[2] In his analysis, Mr. Curry studied five construction projects, one of which was not yet completed, to determine the costs of two major components of a sanitary facility, the capacity part and the collection part.[3] In his calculations, Mr. Curry did not use the actual historical costs associated with the projects. Instead, he used bid projections because this approach would be more cost effective. Once he obtained the bid prices, Mr. Curry applied cost indices to the bid prices in order to determine the current costs of constructing sewage facilities. In performing his analysis, Mr. Curry did not deduct interest and other financing fees paid on bonds from the cost calculations. Moreover, Mr. Curry did not deduct expenses relating to outstanding debt. Finally, the calculation assumed that each proposed EDU would utilize 350 gallons of water per day. As a result of Mr. Curry's calculations, the new tapping fee was set at $3,400.00 per EDU by the Authority.

## B. CONNECTION FEE

On September 11, 1991, the Authority adopted Resolution No. 84. Pursuant to this resolution, the new connection fee would be $800.00 per EDU. Because the township initially incurred the connection fee, it provided the analysis for the calculation of the connection fee.

The Township divided its connection costs into three categories: direct costs, indirect costs, and escalation/c.p.i. adjustment. Direct costs consisted of administrative review, installation, and inspection costs. Indirect costs comprised general administrative overhead costs.[4] Finally, the Township applied a six percent escalation adjustment.

## C. PROCEDURAL HISTORY

Because the new tapping and connection fees would total approximately $1.1 million dollars, the Wests decided not to build the apartment complex because the project had become economically unfeasible. In late 1991, the Wests filed a two-count civil action against the Township and the Authority.

In the first count, the Wests sought an order under the Municipality Authorities Act of 1945, Act of December 2, 1990, P.L. 1343, *as amended*, 53 P.S. §§ 301–322, that the Authority's new tapping and connection fees were improper. Specifically, the Wests alleged that the new tapping and connection fees were not reasonable, uniform, or valid and that they were not properly enacted. Consequently, the Wests asserted that the Authority abused its discretion in enacting them.

In their second count, the Wests sought a declaratory judgment that the connection and tapping fees enacted by the Authority were invalid pursuant to Section 1 of the Municipality Authorities Act, 53 P.S. § 306A(t)(1). Also within their second count, the Wests sought a declaration that the Authority's fees were in violation of the Pennsylvania Constitution. In response, the Township and the Authority filed counterclaims, alleging that they were entitled to attorney's fees because the Wests' action was not brought in good faith.

The trial court conducted a bench trial over three days. After the close of the Wests' case in chief, the trial court, on November 9, 1993, granted the Township's motion for a directed verdict. By order dated March 28, 1994, the trial court found in favor of the Authority and denied the Wests' re-

---

2. Mr. Curry was employed by the Authority's engineer, Roy F. Weston, Inc.

3. The capacity part consisted of the actual treatment works and related facilities, whereas the collection part consisted of the mains, the hydrants, and the pumping facilities.

4. General administrative overhead consisted of costs associated with personnel, support staff, insurance, legal fees, and building maintenance/depreciation.

quest for a declaratory judgment. By the same order, the trial court denied the Authority's and the Township's requests for attorney's fees. The Wests and the Township separately appealed to our court, and we consolidated the appeals for disposition.

## II. *ISSUES*

The Wests raise the following issues: (1) whether, as a result of amendments in 1990 to the Municipality Authorities Act, our scope of review has changed; (2) whether the Authority and the Township properly calculated the tapping and connection fees; and (3) whether the tapping and connection fees, as calculated, are unconstitutional under the Pennsylvania Constitution.

In its appeal, the Township raises the following issue: whether it is entitled to an award of attorney's fees because the Wests' action was not brought in good faith.

## III. *DISCUSSION*

### A. *WHETHER OUR SCOPE OF REVIEW HAS CHANGED AS A RESULT OF THE AMENDMENTS TO THE MUNICIPALITY AUTHORITIES ACT IN 1990.*

In *Life Services v. Chalfont–New Britain Township,* we stated that:

> [t]he burden is upon [the challenging party] to prove that the Authority abused its discretion by establishing a rate system which was either unreasonable or lacking in uniformity.... Our scope of review on appeal is limited to considering whether the factual findings are supported by substantial evidence and whether the law was properly applied to the facts.

107 Pa.Commonwealth Ct. 484, 484, 528 A.2d 1038, 1040 (1987) (citations omitted).

■ The Wests initially contend that because of the amendments to the Municipality Authorities Act in 1990,[5] our scope of review has changed. Specifically, the Wests believe that once an authority decides to impose specific fees and charges for the construction

and maintenance of a facility, such fees must be calculated pursuant to the formulas set forth in Section 1 of the Municipality Authorities Act. Accordingly, the Wests submit that our scope of review is to determine whether the Authority's actions in calculating the fees were authorized by Section 1 of the Municipality Authorities Act and whether the Authority exceeded its power by imposing a fee that was not provided for by Section 1 of the Municipality Authorities Act.

We note that our scope of review as set forth in *Life Services* accomplishes exactly what the Wests want. Pursuant to *Life Services,* our role, as an appellate court, is to examine whether the law as set forth in Section 1 of the Municipality Authorities Act was properly applied to the facts of the instant case. Accordingly, the Wests' arguments must fail.

### B. *WHETHER THE AUTHORITY AND THE TOWNSHIP PROPERLY CALCULATED THE TAPPING AND CONNECTION FEES.*

With respect to the next issue, the Wests initially contend that the Authority and the Township did not set the tapping and connection fees in conformity with Section 3 of the Municipality Authorities Act, 53 P.S. § 306B(h), which requires that rates be reasonable, uniform, and for providing an actual benefit. Pursuant to the statutory scheme of the Municipality Authorities Act, the Authority's rates are reasonable, uniform, and for the purpose of providing an actual benefit if they comply with the specific mandates of Section 1 of the Municipality Authorities Act. According to the Wests, the Authority and the Township ignored certain provisions of Section 1 of the Municipality Authorities Act, as set forth below, in their calculation of the tapping and connection fees.

### 1. THE STATUTORY BACKGROUND FOR THE COMPUTATION OF TAPPING FEES.

The Municipality Authorities Act provides in pertinent part the following methodology for the computation of a tapping fee:

---

5. Section 4(B)t of the Municipality Authorities Act of 1945 was substantially amended by Section 1 of the Municipality Authorities Act. The amendments enumerated and defined the three

types of permitted fees: connection fees, customer facilities fees and tapping fees. Below, we will deal with the amendments' specific changes that are relevant to the instant appeal.

B. Every Authority is hereby granted, and shall have and may exercise all powers necessary or convenient for the carrying out of the aforesaid purposes ... the following rights and powers:

\* \* \* \* \* \*

(t) To charge certain enumerated fees to property owners who desire to or are required to connect to the Authority's sewer or water system.

\* \* \* \* \* \*

(1) The fees may include some or all of the following fee components, which shall be separately set forth in the appropriate resolution of the Authority establishing such fees:

\* \* \* \* \* \*

(iii) Tapping fee. A fee which shall not exceed an amount based upon some or all of the following fee components, which shall be separately set forth in the appropriate resolution of the Authority establishing the fee.

(A) Capacity part. A fee for capacity-related facilities which may not exceed an amount that is based upon the cost of such facilities.... Such facilities may include those that provide existing service and/or those that will provide future service. The cost of existing facilities, which shall not include facilities contributed to the Authority by person, government or agency, shall be based upon their replacement cost or upon historical cost trended to current cost using published cost indexes, or upon the historical cost plus interest and other financing fees paid on bonds financing such facilities. In the case of existing facilities, outstanding debt related to the facilities shall be subtracted from the cost, provided however, no debt shall be subtracted which is attributable to facilities exclusively serving new customers.

\* \* \* \* \* \*

Under all cost approaches, the cost of said facilities shall be reduced by the amount of any grants or capital contributions which have financed such facilities. The capacity part of the tapping fee per unit of capacity required by the new customer shall not exceed the cost of the facilities as described herein divided by the design capacity of the facilities.

\* \* \* \* \* \*

(B) Distribution or collection part. A fee which may not exceed an amount based upon the cost of distribution or collection facilities required to provide service, such as mains, hydrants and pumping stations. Such facilities may include those that provide existing service and/or those that will provide future service. The cost of existing facilities ... shall be based upon their replacement cost or upon historical cost trended to current cost using published cost indexes or upon the historical cost plus interest and other financing fees paid on bonds financing such facilities. In the case of existing facilities, outstanding debt related to the facilities shall be subtracted from the cost, provided however, no debt shall be subtracted which is attributable to facilities exclusively serving new customers. Under all cost approaches, the cost of said facilities shall be reduced by the amount of any grants or capital contributions which have financed such facilities. The distribution or collection part of the tapping fee per unit of capacity required by the new customer shall not exceed the cost of the facilities as described herein divided by the design capacity of the facilities.

53 P.S. § 306B(t)(1)(iii)(A) and (B).

■ Thus, according to the statute, in order to determine a proper tapping fee, three factors must be considered: (1) the cost of the facility, (2) the design capacity of the facility, and (3) the requirements of the new customer. These factors are drawn from the aforementioned statutory language, which provides that each component fee[6] "per unit

---

6. As previously indicated, the component parts of the tapping fees consist of the capacity party, the distribution or collection part, the special purpose part, and the reimbursement part. 53 P.S.

of capacity required by the new customer shall not exceed the cost of the [component parts of the] facilities ... divided by the design capacity of the facilities." 53 P.S. § 306B(t)(1)(iii)(A) and (B).

### 2. THE WESTS' ARGUMENTS THAT THE AUTHORITY IMPROPERLY CALCULATED THE COST FACTOR OF THE TAPPING FEE.

The Wests maintain that in setting the tapping fee, the Authority erred regarding each of the three factors. Specifically, the Wests argue that with respect to the cost factor, it was error for the Authority (1) to rely on bid prices and not actual costs; (2) to include interest and other financing fees paid to bonds in their calculation of costs; (3) to include "outstanding debt" in their calculation; (4) to include grants or capital contributions that have financed such facilities; (5) to include costs associated with the expanding, replacing, updating or upgrading facilities serving existing customers in order to meet stricter efficiency, environmental, regulatory or safety standards or to provide better service to, or meet the needs of, existing customers; (6) to include maintenance and operation expenses; and (7) to include costs associated with the expanding, replacing, updating or upgrading facilities servicing existing customers.

### 3. OUR ANALYSIS OF THE AUTHORITY'S COMPUTATION OF THE COST FACTOR.

We begin our analysis of the Authority's calculation of the instant tapping fee by noting that our legislature has set forth three methods for the calculation of the cost of the capacity and collection facilities. These costs can be calculated by obtaining the following figures: (1) the replacement cost of a facility; (2) the historical cost trended to current cost using published cost indices; or (3) the historical cost plus interest and other financing fees paid on bonds financing such facilities. 53 P.S. § 306B(t)(1)(iii)(A) and (B).

According to the Authority's own expert, Mr. Curry, it used the second method, historical cost trended to current cost using published cost indices. Reproduced Record (R.R.) at 879a–887a. Furthermore, in his calculation of the historical cost, Mr. Curry testified that he used bid prices and not actual cost figures because this approach was more cost effective. R.R. at 904a. We conclude that this was error.

Historical cost is not the same as bid prices. It is clear that in the final analysis bid prices may be higher or lower than the actual historical cost. We cannot sanction a more cost effective approach when the statute is clear and free from doubt. Therefore, we hold that Section 1 of the Municipality Authorities Act requires municipalities and attendant authorities to utilize actual historical cost and not bid prices. Accordingly, we must remand the instant matter to the trial court for further calculations employing actual historical cost. However, we continue with our analysis to provide further guidance on remand.

Regarding the alleged failure of the Authority to exclude interest, financing fees, outstanding debt and grants from its calculations, we note that the Authority's own expert, Mr. Curry, testified that he did not deduct certain financing and interest costs and outstanding debt costs from his calculations. R.R. at 925a–928a. This is in contradiction of Section 1 of the Municipality Authorities Act. Thus, on remand these costs must be deducted from the calculations. The Authority maintains that these amounts were not deducted from the calculations because they were never included in the bid prices. According to the Authority, bid prices would not *ipso facto* include the aforementioned items, such as debt service, because a contractor bidding on a construction project would not bear any portion of any authority's debt service. However, the Authority's own expert admitted that some of these costs were not deducted from his calculations. Therefore, on remand, these costs must be subtracted from the calculation.

§ 306B(t)(1)(iii)(A), (B), (C) and (D). Because the Authority only utilized two of the component parts in calculating its tapping fee, we will only examine those two parts: the capacity and collection parts.

With respect to the maintenance and operation expenses, we note that Section 1 of the Municipality Authorities Act provides in pertinent part that:

(E) Calculation of tapping fee components.

(I) In arriving at the cost to be included in the tapping fee components, the same cost shall not be included in more than one part of the tapping fee.

(II) No tapping fee may be based upon or include the cost of expanding, replacing, updating or upgrading facilities serving existing customers in order to meet stricter efficiency, environmental, regulatory or safety standards or to provide better service to, or meet the needs of, existing customers.

(III) The cost used in calculating tapping fees shall not include maintenance and operation expenses. As used in this clause, 'maintenance and operation expenses' are those expenditures made during the useful life of a sewer or water system for labor, materials, utilities, equipment accessories or appurtenances and other items which are necessary to manage and maintain the system capacity and performance and to provide the service for which the system was constructed.

53 P.S. § 306B(t)(1)(iii)(E)(I), (II) and (III).

■ The Wests expressly maintain that the Authority violated this provision by failing to exclude costs of approximately $638,000.00 for the construction of facilities to correct peak hydraulic capacity problems related solely to existing users and by failing to exclude the costs involved in bringing the existing facility into compliance with certain water and sewage standards by removing ammonia.

The Authority's expert, Mr. Curry, testified that the peak hydraulic capacity problems were not solely related to existing users. In his calculations, Mr. Curry attributed approximately ten percent of the project's costs to new users.[7] R.R. at 677a and 930a. The Wests' expert, Mr. Karl P. Sieg, testified that the hydraulic problem was solely related to the existing customers and no amount should have been allocated to new users. R.R. at 677a.

The trial court did not specifically address the issue. However, it is clear by its opinion that it found Mr. Curry more credible. Because we are bound by the trial court's determination, we conclude that it was not error to include the $638,000 in the calculations.

With respect to the next cost, we have reviewed the record and are unable to determine whether the cost of removing ammonia from the system should have been excluded from the calculations. There is a complete lack of testimony indicating whether the cost of removal was to serve existing customers in order to meet stricter efficiency, environmental, regulatory or safety standards. Without such testimony, we are unable to conduct meaningful appellate review. Thus, on remand, the parties should adequately address this concern.

■ Finally, the Wests claim that there was no deduction from cost made in the calculations for equipment that was no longer in use. Thus, according to the Wests, this cost only benefitted existing users. Specifically, the Wests' expert, Mr. Sieg, stated that:

the cost of existing facilities in Hampton Township does not reflect that significant portions of the useful lives of the existing facilities have expired. For example, the original belt filter press installed in 1978, remains in the cost basis, although its useful life expired in 1986 when it was removed from service and the new belt filter press facility was provided. For another example, the cost of the rotostrainers installed in 1978 but removed in the 1991 project remains in the cost basis, even though the rotostrainers no longer exist. Numerous other facilities that no longer exist appear to remain in the cost basis although they were 'used up' in the past by existing customers.

R.R. at 626a.

■ The Authority's expert, Mr. Curry, testified that his calculations included the cost of equipment that was no longer in use. R.R. at 931a–932a. This was error. By definition, equipment that is no longer in use cannot benefit new customers. Therefore,

---

7. This ten percent equaled the $638,000.00 figure.

they should not have to bear the cost of such equipment. However, we reject the Wests' argument that fully depreciated equipment that is still in use should also be excluded from the calculations. Equipment that is fully depreciated, but still in use, clearly benefits new users in part. Accordingly, they should have to pay their fair share of that cost.

### 4. THE WESTS' ARGUMENTS THAT THE AUTHORITY IMPROPERLY CALCULATED THEIR WATER REQUIREMENTS AND THE DESIGN CAPACITY OF THE FACILITY.

With respect to the next two factors comprising the tapping fee, the Wests argue that the Authority erred in determining their water and sewage requirements and in calculating the design capacity of the facility. Specifically, the Wests maintain that the Authority incorrectly assumed that each of the Wests' EDU would use 350 gallons of water per day.[8] Moreover, the Wests assert that instead of using 3.2 million gallons of water as the overall design capacity of the facility,[9] the Authority utilized the number 9142 EDU, which was calculated by dividing 3.2 million gallons by 350. The Authority then calculated the portion of the total system capacity that would be used by new users, and determined that new users would utilize 1.25 million gallons per day of the total capacity. The Authority divided 1.25 million gallons per day by 350 to arrive at an EDU number of 3571. In sum, according to the Authority, only 3571 new users would be able to connect to the system.

### 5. OUR ANALYSIS OF THE AUTHORITY'S CALCULATION OF THE WESTS' WATER REQUIREMENTS AND ITS CALCULATION OF THE DESIGN CAPACITY OF THE FACILITY.

 Our review of the record indicates that the Authority miscalculated the Wests'

---

**8.** At trial, the Wests presented evidence that each apartment would utilize between 120 and 140 gallons of water per day.

**9.** The Wests arrived at 3.2 million gallons per day by adding the capacity of the existing facility

water requirements and the facility's design capacity.

At trial, Mr. William Roth, an engineer retained by the Wests, testified that he conducted a flow study of water usage at an apartment complex owned by the Wests, which was similar to the proposed development. Based on his study, Mr. Roth testified that the Wests' proposed development would require approximately 138 gallons per day as its maximum usage at any one peak time. R.R. at 851a. Consequently, the Wests assert that the Authority improperly assumed a maximum of 350 gallons per day.

In contradiction to Mr. Roth, the Authority's expert, Mr. Curry, arrived at the 350 gallons per day figure as follows:

Q. Okay. Now, you keep referring—you have referred now to that figure, 350 gallons. Where did you get that 350 gallons per EDU figure?

A. Well, it's a figure that comes from a number of different locations. The one that might be of the greatest significance is that it's in the permitting documents for the treatment works, so that the capacity is divided up that way.

It's also—it exists in most of the technical literature that we use to design treatment facilities. It's a generally accepted number embedded in a lot of regulations and technical literature that expresses the average amount of flow from a housing unit.

R.R. at 891a–892a.

The Wests' expert, Mr. Sieg, provided the following uncontradicted supplementary testimony indicating the specifics of the figure:

Q. And how did they arrive at 350 gallons per EDU?

A. The number 350 gallons per EDU is a value that has customarily been used

---

of 1.95 million gallons per day (which was comprised of the 1970, 1978, 1986, and 1989 projects) to the 1991 project that would add an additional 1.25 million gallons per day.

for planning purposes to estimate quantities of sewage flow. It is related to the DER value of 100 gallons per person per day that we find in the sewage manual and three-and-a-half persons per dwelling unit which is a value stated in Chapter 73 of the DER regulations as the 1970 census value of persons per household.

Q. So the 3.5 persons per household is based on a 1970 census.

A. According to Chapter 73 of the DER regulations, if you look at the U.S. census, you will find that the value is found in 1950 both in Pennsylvania and the United States as a whole.

Q. Is there a current population value per household based on 1980 or 1990 census?

A. Yes.

Q. What would that be?

A. 1990 census shows the value in Pennsylvania is 2.57 persons per household.

Q. And was the value of 2.57 used in any of these calculations?

A. No.

R.R. at 659a.

By its decision, the trial court clearly rejected Mr. Roth's testimony and ancillary flow study. Thus, we are bound by this decision. However, we believe that the trial court erred as a matter of law in approving the 350 gallons per EDU. The uncontradicted testimony indicated that the 350 gallon figure was predicated on an outdated 1950 census figure of 3.5 persons per household multiplied by the DER figure of 100 gallons per person of usage. Because the legislature has determined that rates are to be "for the purpose of providing an actual benefit,"[10] it is improper for the Authority to rely on a figure that is different from the more current numbers. Failure to abide by the more current numbers would result in rates that are significantly higher than actually warranted. Accordingly, we conclude that the Authority erred in determining that the Wests' needs

10. Section 3 of the Municipality Authorities Act, 53 P.S. § 306B(h).

11. The Township provided the figures for the costs associated with the connection fee because

would be 350 gallons per EDU. On remand, the Authority should employ numbers that are indicative of more current figures. Because the Authority's design capacity calculation was dependent on the Wests' specific requirements (see subsection E), the Authority should, on remand, recalculate the figure using the more current numbers.

### 6. THE WESTS' ARGUMENTS THAT THE AUTHORITY AND THE TOWNSHIP IMPROPERLY CALCULATED THE CONNECTION FEE.

The Wests also challenge the Authority's calculation of the connection fee. The Authority concluded based on the Township's figures that a reasonable connection fee would be $800.00 per connection.[11] According to the Wests, the connection fee was improperly calculated because: (1) neither the Township nor the Authority pay for the actual cost of connection; (2) the costs delineated by the Township, and applied by the Authority, were neither indicative of the actual costs of the connection for which the fee is charged, nor of the average costs based upon different types and sizes of connections; and (3) the fee was comprised of expenses that were not related to the cost of the connection fee.

### 7. OUR ANALYSIS OF THE AUTHORITY'S AND THE TOWNSHIP'S COMPUTATION OF THE CONNECTION FEE.

Section 1 of the Municipality Authorities Act provides that a connection fee shall be based on the following:

B. Every Authority is hereby granted, and shall have and may exercise all powers necessary or convenient for the carrying out of the aforesaid purposes ... the following rights and powers:

\* \* \* \* \* \*

the costs are incurred in the first instance by the Township and then charged back to the Authority.

(t) To charge certain enumerated fees to property owners who desire to or are required to connect to the Authority's sewer or water system.

\* \* \* \* \* \*

(1) The fees may include some or all of the following fee components, which shall be separately set forth in the appropriate resolution of the Authority establishing such fees:

(i) Connection fee. A fee which shall not exceed an amount based upon the actual cost of the connection for the property extending from the Authority's main to the property line or curb stop of the property so connected. The Authority may also base such fee upon an average cost for previously installed connections of similar type and size. In lieu of the payments of the fees, an Authority may require the construction and dedication of those facilities by the property owner or owners requesting such connection.

53 P.S. § 306B(t)(1)(i).

■■■ Our review of the record reveals that the Authority's calculation of its connection fee does not comport with the requirements of Section 1 of the Municipality Authorities Act. The statute provides that the connection fee cannot exceed the actual cost of the connection for which the fee is charged or must be based upon the average cost of past connections that are similar to the connection for which the fee is being charged. Contrary to this provision, the Authority divided its connection costs into three categories: direct costs, indirect costs, and escalation/c.p.i. adjustment. These costs were neither the actual costs of the connection nor were they the average costs of all connections separated by type or size. Accordingly, on remand, the Township and the Authority must recalculate the connection fee so that it conforms to either the accumulated specific cost data for the connection involved or to the average of actual costs of connections involving similar connections.

### C. WHETHER THE TAPPING AND CONNECTION FEES, AS CALCULATED, ARE UNCONSTITUTIONAL UNDER THE PENNSYLVANIA CONSTITUTION.

The Wests next contend that the tapping and connection fees charged by the Authority violate Article I, Section 1[12] and Article VIII, Section 1[13] of the Pennsylvania Constitution. Specifically, the Wests allege that in contravention of the Pennsylvania Constitution the fees, as an assessment, do not relate to any benefit conferred on them and do not relate to any of the Authority's costs.

■■■ Having already concluded that the fees are improper as currently calculated, we apply the long-standing principle that courts should not decide constitutional questions if cases can be decided on non-constitutional grounds. *Friedlander v. Zoning Hearing Board of Sayre Borough*, 119 Pa.Commonwealth Ct. 164, 546 A.2d 755 (1988). Accordingly, we will not discuss the constitutional issue.

### D. WHETHER THE TOWNSHIP SHOULD BE ENTITLED TO AN AWARD OF ATTORNEY'S FEES.

■■■ In its appeal, the Township claims that the trial court erred in failing to award it attorney's fees, pursuant to Section 2503 of the Judicial Code, 42 Pa.C.S. § 2503, because the Wests' action was brought arbitrarily, vexatiously and in bad faith, and because the Wests were dilatory, obdurate and vexatious during the pendency of the matter.

---

**12.** Article I, Section 1 of our constitution provides:

All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

**13.** Article VIII, Section 1 provides:

All taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws.

It is a commonly accepted principle that the reasonableness of a refusal to grant an award of attorney's fees is a matter which rests within the sound discretion of the trial court and will be altered by an appellate court only when there is a clear abuse of discretion. *Shearer v. Moore*, 277 Pa.Superior Ct. 70, 419 A.2d 665 (1980). In its opinion, the trial court did not set forth reasons why it refused to award the Township attorney's fees. However, after a thorough review of the record, we hold that the trial court did not abuse its discretion in failing to award attorney's fees. We determine that the Wests' action was neither brought in bad faith nor was their conduct vexatious during the pendency of the matter. The record reveals that the Township was an integral party to the action because it provided the necessary calculations to the Authority for the computation of the connection fee. R.R. at 895a–897a. Accordingly, we reject the Township's arguments in this regard.

## IV. CONCLUSION

Based on the foregoing reasons, we reverse the order of the trial court and remand the matter to it for further determinations in accordance with this decision.

### ORDER

AND NOW, June 28, 1995, we reverse the order of the Court of Common Pleas of Allegheny County and remand the matter to it for further proceedings in accordance with this opinion.

We relinquish jurisdiction.