**`Alex S. HORNSTEIN, Appellant**

v.

**LYNN TOWNSHIP SEWER AUTHORITY.**

Commonwealth Court of Pennsylvania.

Argued Dec. 7, 2004.

Decided Jan. 25, 2005.

---

See also 634 A.2d 704.

**1194** ■ ▬▬▬▬▬▬▬

Emil W. Kantra, II, Center Valley, for appellant.

William E. Schantz, Allentown, for appellee.

BEFORE: LEADBETTER, Judge, COHN JUBELIRER, Judge, and JIULIANTE, Senior Judge.

OPINION BY Senior Judge JIULIANTE.

Alex S. Hornstein appeals from the September 24, 2003 order of the Court of Common Pleas of Lehigh County (trial court) that denied Hornstein's appeal from the Lynn Township Sewer Authority's (Authority's) adoption of Resolution No. 3 of 2002 (Resolution 3–02), which established a sewer tapping fee of $4,000.00 per connection to the Authority's sewer system. For the reasons that follow, we affirm.

Hornstein is the owner and developer of a residential subdivision known as Madison Park North (MPN) in Lynn Township (Township). When completed, MPN will contain 104 townhouse units and two apartment buildings with 6 dwelling units each.

Hornstein obtained final approval for MPN on November 3, 1998. The Authority approved plans for MPN's interior sewer collection system. The record also reflects that pursuant to the terms of a January 31, 1995 Subdivision Improvement/Maintenance Agreement (Subdivision Agreement) between Hornstein and the Township, Hornstein was to be exempt from the payment of any tapping fees for houses in MPN from September 19, 1994 through September 19, 1999. On May 22, 1995, the Authority became a party to the Subdivision Agreement. Later in 1995, the Township transferred ownership of the sewer system back to the Authority.[1]

On October 11, 1995, the Authority enacted Resolution No. 2 of 1995 (Resolution 2–95), which established a tapping fee of

---

1. In *Hornstein Enters., Inc. v. Tp. of Lynn,* 160 Pa.Cmwlth. 72, 634 A.2d 704 (1993) *(Hornstein I),* this Court concluded that the Township lacked the authority under either The Second Class Township Code (Act of May 1, 1933, P.L. 103, *as amended,* 53 P.S. §§ 65101–68701), or Article V–A of the Pennsylvania Municipalities Planning Code (Act of December 19, 1990, P.L. 1343, *as amended,* 53 P.S. § 10501–A—10507–A), to impose a tapping fee upon a developer to tap into a subdivision sewer system built by the developer.

$4,000.00 per connection based upon calculations in a 1995 report by F & M Associates, Inc. (F & M), the Authority's engineer at that time. On June 30, 1998, however, the Authority's Board voted to adopt its "Connection Management Plan," which limited the number of sewer permits per developer to 10 per year and also limited to 20 the total number of connections to the system that would be available during each one-year period until additional treatment capacity was provided.

On December 31, 1999, Hornstein filed 10 applications for sewer tapping permits for MPN. Prior to filing the applications, Hornstein was advised that there would be a tapping fee of $4,000.00 for each of the ten sewer permits. At the time of filing, Hornstein deposited, under protest, $40,000.00 with the request that the Authority consider his argument that the tapping fee was improper and, therefore, that the permits should be issued without the payment of any tapping fee.

At a January 18, 2000 meeting, the Authority's Board voted to deny Hornstein's request for issuance of the permits without payment of the tapping fee and also denied his request that the $40,000.00 be refunded to him. Section 4 of the former Municipality Authorities Act of 1945 (the 1945 Act), Act of May 2, 1945, P.L. 382, *formerly* 53 P.S. § 306, established standards for calculating tapping fees. Although Section 4 has been repealed effective June 19, 2001, it is nevertheless applicable to Hornstein's sewer applications.[2]

On February 16, 2000, Hornstein appealed the Authority's imposition of the tapping fee to the trial court. Following a bench trial at which both parties presented evidence, the trial court concluded that in light of the existing problem of inadequate facilities to accommodate new development, the Authority had a rational basis for enacting the Connection Management Plan and imposing a tapping fee to recover permissible costs.

With regard to the method of calculating the tapping fee, however, the trial court determined that Hornstein's appeal had merit. Specifically, the trial court determined that pursuant to Section 4B(t)(1)(iii)(E)(II) of the 1945 Act, *formerly* 53 P.S. § 306B(t)(1)(iii)(E)(II), a tapping fee cannot include the cost of upgrading the facilities to benefit existing customers. F & M, the Authority's engineering firm, supplied the report upon which the Authority based its $4,000.00 tapping fee.

F & M's report, which was incorporated into Resolution 2–95, listed the component parts of the tapping fee, *i.e.*, capacity part-existing, capacity part-future and collection part-existing. The total of the three component parts was $4,984.86. The Authority, though, reduced the tapping fee to $4,000.00.

The trial court noted that the capacity part-future component of the fee, which amounted to $2,011.25, covered the costs of upgrades that would benefit both new users and present users. Pursuant to Section 4B(t)(1)(iii)(E)(II) of the 1945 Act, however, the portion of the upgrade cost that benefited existing users should have been excluded.

2. Section 4 of the 1945 Act was repealed by the Act of June 19, 2001, P.L. 287 and reenacted by the same Act as Section 5607 of the *new* Municipality Authorities Act, 53 Pa.C.S. § 5607. Nevertheless, Section 2 of the Act of June 19, 2001, P.L. 287, provides that "[t]he provisions of this act shall not affect any act done, liability incurred or right accrued or vested or affect any suit pending or to be instituted to enforce any right or penalty under the authority of such repealed laws." As such, Section 4 of the 1945 Act continued to be applicable at all relevant times in this matter.

Inasmuch as the trial court could not determine what portion, if any, of the $2,011.25 capacity part-future component that actually benefited existing customers was included in the $4,000.00 fee, the trial court invalidated the fee. As a result, the trial court remanded the matter to the Authority to properly recalculate the tapping fee.

On remand, the Authority directed its current engineering firm, ARRO Consulting, Inc. (ARRO), to recalculate the tapping fee. ARRO concluded that the maximum tapping fee the Authority could charge is $6,055.00 based on the following three components: (1) collection part-existing—$3,600.00, (2) capacity part-existing—$2,055.00 and (3), capacity part-future—$400.00.

In determining the collection part-existing component, ARRO determined the historical cost to construct the existing collection part of the system and "trended"[3] that cost to September 1995, the date for which the trial court directed the Authority to recalculate the tapping fee. After determining the trended cost of the collection part ($1,877,775.65), ARRO reduced that amount by the amount of a federal grant ($657,141.25) that was received for funding those facilities. The outstanding debt ($68,545.86) was also deducted from the trended cost of the collection part.

That amount ($1,152,088.60) was then divided by 80,000 gallons per day (gpd), which was the system capacity in 1995. This resulted in a collection cost of $14.40 per gpd. ARRO then multiplied the

$14.40 by 250 gpd to determine the amount each owner of an "equivalent dwelling unit" (edu) should be charged per day.

ARRO based the 250 gpd/edu amount on a 1990 census figure reflecting 2.79 people per dwelling unit in the Township. This figure was multiplied by 100 gpd, a figure included in the Department of Environmental Protection's (DEP's) Domestic Wastewater Facilities Manual (DEP Manual).[4] This resulted in a figure of 250 gpd/edu. Multiplying the $14.40 by 250 gpd/edu, ARRO determined that the Authority could charge a maximum of $3,600.00 per tapping fee for the collection part-existing component.

With regard to the capacity part-existing component, ARRO took the historical cost to construct the existing treatment facility and trended it to 1995. After determining the trended cost ($1,084,095.30), ARRO again deducted a federal grant ($386,858.75) and outstanding debt ($39,573.55). That figure was divided by the 1995 capacity of 80,000 gpd, which resulted in a figure of $8.22 per gpd per person. The 250 gpd/edu was then multiplied by $8.22, which resulted in a maximum chargeable amount per tapping fee for capacity part-existing of $2,055.00.

ARRO also calculated that the Authority could charge per tapping fee for capacity part-future. ARRO concluded that a charge of $400.00 could be charged for the capacity part-future component.

In Resolution 3–02, however, the Authority again reduced the tapping fee to

---

3. As the trial court noted, " '[t]rending' is a permitted component of the tapping fee calculation. It is a method whereby the original cost of sewage treatment facilities is adjusted for the passage of time to account for the cost to construct the same facilities at a future time when the cost would be greater than the original construction costs." Trial Court's January 14, 2002 Opinion at 4; R.R. 141a.

4. At the time the DEP Manual was originally published, the DEP was known as the Department of Environmental Resources (DER) and thus the DEP Manual is sometimes referred in these proceedings as the DER Manual.

$4,000.00. In accord with the trial court's January 14, 2002 opinion, the Authority did not include any charge for the capacity part-future component. Rather, the Authority allocated the tapping fee as follows: (1) collection part-existing—$2,550.00 and (2) capacity part-existing—$1,450.00. At its November 19, 2002 meeting, the Authority determined the effective dates for that fee to be October 11, 1995 through November 19, 2002.

Hornstein timely appealed to the trial court from the Authority's adoption of Resolution 3–02. In his appeal, Hornstein challenged the Authority's calculation of the tapping fee on several grounds. Hornstein argued, *inter alia,* (1) that the Authority erred in trending the historical costs before deducting the federal grants, (2) that the Authority attributed too much sewage flow per edu by arbitrarily using the 250 gpd/edu figures based on the 1990 census and the DEP Manual and (3), that Sections 4B(t)(1)(iii)(E)(II) and (III) of the 1945 Act prohibited the Authority from including inflow and infiltration (I & I) in determining the sewage flow per edu.

■ The trial court rejected Hornstein's arguments and on September 24, 2003, issued an opinion and order affirming the Authority's Resolution 3–02, which again established the $4,000.00 tapping fee.[5] Hornstein's appeal to this Court followed. On review, we are limited to a determination of whether the trial court's necessary findings of fact are supported by substantial evidence and whether the trial court properly applied the law. *Smith v. Athens Tp. Auth.,* 685 A.2d 651 (Pa.Cmwlth.1996).

## I.

■ Hornstein's first argument is that the trial court erred as a matter of law and abused its discretion in concluding that the tapping fee imposed by the Authority did not violate Section 4B(t)(1)(iii)(A) of the 1945 Act inasmuch as: (1) the 250 gpd/edu figure used by the Authority was arbitrary where the uncontradicted evidence indicated that the actual gpd/edu has historically been much less than 250 gpd/edu; and (2), the 250 gpd/edu figure improperly included I & I.

Hornstein asserts that the capacity portion of the tapping fee must be based on the capacity required by the new customer. Hornstein cites 4B(t)(1)(iii)(A) of the 1945 Act which provided in part that "[t]he capacity part of the tapping fee per unit of capacity required by the new customer shall not exceed the cost of the facilities as described herein divided by the design capacity of the facilities." *Formerly* 53 P.S. § 306B(t)(1)(iii)(A).

Hornstein also cites *West v. Hampton Tp. Sanitary Auth.,* 661 A.2d 459 (Pa. Cmwlth.1995), where this Court, in interpreting Section 4B(t)(1)(iii)(A) [capacity part] and (B) [distribution or collection part], stated:

[t]hus, according to the statute, in order to determine a proper tapping fee, three factors must be considered: (1) the cost of the facility, (2) the design capacity of the facility, and (3) the requirements of the new customer. These factors are drawn from the aforementioned statutory language, which provides that each component fee [capacity and collection in the present case] "per unit of capacity required by the new customer shall not

---

**5.** During the previous bench trial, the trial court rejected Hornstein's arguments that (1) the Authority had adopted its Connection Management Plan specifically to thwart his efforts to complete MPN and (2) Section 4B(t)(1)(iii) of the 1945 Act prohibited the Authority from charging him any tapping fees for MPN because he constructed, at his own expense, the sewer facilities necessary to supply service to MPN.

exceed the cost of the [component parts of the] facilities ... divided by the design capacity of the facilities".

661 A.2d at 464–465 (footnote omitted).

Hornstein contends that the Authority's 250 gpd/edu figure is arbitrary and far in excess of the historical data reflecting the actual usage by households throughout the Township. At trial, Hornstein's engineering expert, Russell McIntosh, testified that the Township's historical data indicates that a 145 gpd/edu figure would be more accurate.

Citing *West*, Hornstein further contends that where the uncontradicted evidence indicates that the figures relied on by the Authority are higher than the historical data regarding actual usage, it is improper for the Authority to rely on its higher figures. We believe, however, that Hornstein misinterpreted our decision in *West*.

In *West*, to project daily sewer usage in 1990, the authority used a 350 gpd/edu figure based on 1950 and 1970 census figures, which indicated that there were 3.5 persons per household in Pennsylvania. The 3.5 figure was then multiplied by the 100 gpd/per person guideline in the DEP Manual. We noted in *West*, though, that the 1990 census indicated that there were only 2.57 persons in an average Pennsylvania household. Consequently, we reasoned that

> [b]ecause the legislature has determined that rates are to be "for the purpose of providing an actual benefit," it is improper for the [a]uthority to rely on a figure that is different from the more current numbers. Failure to abide by the more current numbers would result in rates that are significantly higher than actually warranted.... On remand, the [a]uthority should employ numbers

that are indicative of more current figures.

661 A.2d at 468 (footnote omitted).

Apparently, Hornstein interprets *West* as stating that historical data reflecting actual usage must be used instead of a formula multiplying the number of persons per household by the 100 gpd/per capita DEP guideline. In *West*, the developers presented expert evidence indicating that the proposed apartment building would use no more than 138 gpd/edu.

We believe, however, that *West* merely stated that the more recent 1990 census figures should have been used instead of the 1950 and 1970 census figures. Specifically we noted that the "350 gallon figure was predicated on an *outdated* 1950 census figure of 3.5 persons per household," and that "the [a]uthority should, on remand, recalculate the figure *using the more current numbers.*" 661 A.2d at 468 (emphasis added). We did not state in *West* that historical usage data must be used instead of a formula using census figures.

In the present case, Farley F. Fry, ARRO's vice president, testified that the 1990 census data indicated a 2.79 person per household figure, which was higher than the 2.5 person per household figure that the Authority used. N.T. 02/14/03, 41; R.R. 1264; *see also* N.T. Exhibit LTSA–17 (Township's 1990 General Population and Housing Characteristics); R.R. 491a. Fry further testified that the 100 gallons per capita per day figure specified in the DEP's guidelines came very close to the average per capita discharge for the highest three consecutive months in 1994. *Id.* at 41–42; R.R. 1264–1265. Fry stated that this calculation reaffirmed the validity of the DEP 100 gpd/per capita guideline. *Id.*

The Authority also points out that the only historical data for the surrounding area of New Tripoli, an older community, is not the best indicator in this case be-

cause MPN is a new development which will have a higher occupancy rate and is, therefore, likely to have a higher rate of water usage. As the Authority further points out, MPN's residents will have a right to discharge at the maximum 250 gpd/edu level (100 gpd/per capita), if needed. As such, they are not being overcharged based on capacity that they cannot use. Consequently, we conclude that the Authority did not err in using the 2.5 person per household figure or the 100 gpd/per capita guideline in the DEP Manual in determining the tapping fee.

Hornstein also contends that the Authority improperly considered I & I seepage passing through the system in arriving at the 250 gpd/edu figure. Specifically, Hornstein cites to Sections 4B(t)(1)(iii)(E)(II) and (III) of the 1945 Act, which provided in part as follows:

(II) No tapping fee may be based upon or include the cost of expanding, *replacing, updating or upgrading facilities serving existing customers in order to meet stricter efficiency,* environmental, regulatory or safety standards or to provide better service to, or meet the needs of, *existing customers.*

(III) The cost used in calculating tapping fees *shall not include maintenance and operation expenses.* As used in this clause, "maintenance and operation expenses" are those expenditures made during the useful life of a sewer or water system for labor, materials, utilities, equipment accessories or appurtenances and other items which are necessary to manage and maintain the system capacity and performance and to provide the service for which the system was constructed.

*Formerly* 53 P.S. §§ 306B(t)(1)(iii)(E)(II) and (III) (emphasis added).

■ Hornstein asserts that by including I & I seepage in its justification for the 250 gpd/edu figure, the Authority is attempting to circumvent the statutory prohibition against including expenditures for maintenance in the tapping fee calculation. Hornstein further asserts that expenses incurred to remediate I & I are maintenance expenses necessary to sustain the existing capacity of the system and cannot be included in the tapping fee just because they were not properly identified as maintenance expenses.

The trial court, however, determined that the above-cited language in Sections 4B(t)(1)(iii)(E)(II) and (III) of the 1945 Act did not prohibit the inclusion of I & I seepage in the gpd/edu calculation. Citing those statutes, the trial court stated:

This language does not specifically proscribe inclusion of I & I in the tapping fee calculation, nor does it forbid by inference inclusion of I & I. The "cost" which these sections disallow for inclusion in the tapping fee calculation [does] not refer to I & I. The fact remains that the system must process, not only the flow from the units which feed the system, but also the I & I which enters along the way. Without a specific statutory proscription, inclusion of I & I in the [gpd/edu] factor rested with the discretion of the Authority.

Trial Court's September 24, 2003 Opinion at 12; R.R. 1215a.

We agree with the trial court. We believe that nothing in the language in Sections 4B(t)(1)(iii)(E)(II) and (III) prohibited including I & I seepage in the gpd/edu calculation. "[T]he rules of statutory construction do not permit courts to ignore the plain and unambiguous language of a statute in a supposed pursuit of either its spirit *or an unstated legislative intent." Nationwide Mut. Ins. Co. v. Wickett,* 563 Pa. 595, 604, 763 A.2d 813, 818 (2000) (emphasis added).

Rather, Sections 4B(t)(1)(iii)(E)(II) and (III) prohibited including the costs which relate to maintenance and operation expenses in the calculation of a tapping fee. Although those maintenance expenses could include the cost to repair the system to reduce I & I seepage, nothing in Sections 4B(t)(1)(iii)(E)(II) and (III) precluded an allowance for I & I in the gpd/edu calculation. As a result, we conclude that the trial court did not err in determining that the Authority could allow for I & I seepage in its gpd/edu calculation.

## II.

■■■ Hornstein's second argument is that the trial court erred as a matter of law and abused its discretion by approving the method of trending used by the Authority inasmuch as the grants received by the Authority were deducted after rather than before trending, which allegedly resulted in an inflated tapping fee. Hornstein contends that the purpose of the tapping fee is to establish a rational and fair means for municipal authorities to recover costs incurred by them to construct existing facilities and, therefore, that the grant should be deducted from the actual cost of constructing the facilities, not historical costs that have been trended to reflect current costs.

As an example, Hornstein points out that if it would cost an authority $1,000,000.00 to construct a facility in Year X, and the authority received a $1,000,000.00 grant to construct it, no tapping fee would be justified if the grant was deducted prior to trending. If the construction costs, however, were trended to reflect current or replacement costs at Year X plus 10, the grant would not cover the trended cost and, therefore, the authority could charge a tapping fee despite not having incurred any costs to construct the existing facilities.

Section 4B(t)(1)(iii)(A) of the 1945 Act provided in pertinent part that a tapping fee may recover the following:

Capacity part. A fee for capacity-related facilities which may not exceed an amount that is based upon the cost of such facilities, including, but not limited to, source of supply, treatment, pumping, transmission, trunk, interceptor and outfall mains, storage, sludge treatment or disposal, interconnection or other general system facilities. Such facilities may include those that provide existing service and/or those that will provide future service. *The cost of existing facilities,* which shall not include facilities contributed to the Authority by any person, government or agency, shall be based upon their replacement cost *or upon historical cost trended to current cost using published cost indexes,* or upon the historical cost plus interest and other financing fees paid on bonds financing such facilities. . . . .

. . . .

*Under all cost approaches,* the cost of said facilities shall be reduced by the amount of any grants or capital contributions which have financed such facilities.

*Formerly* 53 P.S. § 306B(t)(1)(iii)(A) (emphasis added).

The Authority asserts that the *recoverable costs* under Section 4B(t)(1)(iii)(A) referred to the current value of the facilities, not the historical cost to construct it. The Authority further asserts that the three statutory methods to determine the costs of the facilities, *i.e.,* (1) trending using cost indices which measure inflation, (2) historical cost plus financing costs incurred and (3), replacement cost, each measure the increased value of the system in the interim between its original construction and when the tapping fees are set.

The Authority also points out that Section 4B(t)(1)(iii)(A) *first* set forth the three methods to calculate recoverable costs and *then* stated that "[u]nder all cost approaches, the cost of said facilities shall be reduced by the amount of any grants or capital contributions which have financed such facilities." Therefore, the Authority contends that Section 4B(t)(1)(iii)(A) established a process where the recoverable costs are first determined based on one of the three allowable methods and then the grants are deducted from the recoverable cost.

We note that the trial court concluded that nothing in the statute prevented the Authority from first trending the historical costs to current costs before deducting the grants. Furthermore, we agree with the Authority that the *recoverable costs* under Section 4B(t)(1)(iii)(A) were those that were established by one of the three methods, which essentially determined the current value of the facilities. Specifically, the statute provided that "[t]he cost of existing facilities, which shall not include facilities contributed to the Authority by any person, government or agency, *shall be based upon their replacement cost or upon historical cost trended to current cost using published cost indexes* ...." *Formerly* 53 P.S. § 306B(t)(1)(iii)(A) (emphasis added).

The statute then provided that the "cost" of the facilities was to be reduced by the amount of any grants. The statute did not state, as Hornstein appears to interpret it, that any grants were to be deducted from the historical cost of the facilities before the replacement cost or trended cost was determined. Consequently, we conclude that Hornstein's contention, that Section 4B(t)(1)(iii)(A) required that grants be deducted from the historical cost of the facilities before trending, lacks merit.

III.

Hornstein's third argument is that the trial court erred as a matter of law or abused its discretion in concluding that it was proper for the Authority to include as part of the tapping fee a charge for collection part-existing notwithstanding the fact that Hornstein provided the collection system for MPN. In support of his position, Hornstein cites to Section 4B(t)(1)(iii) of the 1945 Act, which provided in part that "[i]n lieu of the payment of the [tapping] fee, an Authority may require the construction and dedication of only such capacity, *distribution—collection* or special purpose facilities *necessary to supply service* to the property owner or owners." *Formerly* 53 P.S. § 306B(t)(1)(iii) (emphasis added). Hornstein asserts that at the cost of $300,000.00, he constructed the collection system for MPN and that part of the system has already been dedicated to and accepted by the Authority.

■ Although Hornstein acknowledges that MPN uses collection lines, *i.e.*, sewer mains outside of the geographical area of the development which convey sewage to the treatment plant, and that he did not construct those lines, he nevertheless asserts that the above-cited language Section 4B(t)(1)(iii) of the 1945 Act still applied with regard to MPN's collection system. Hornstein further contends that the 1945 Act provided a separate mechanism in Section 4B(z.1) of the 1945 Act, *formerly* 53 P.S. § 306B(z.1), for a developer who constructed collection facilities for common usage to recoup a portion of those facilities so constructed. Section 4B(z.1) provided in part:

> Where a property owner constructs or causes to be constructed at his expense any extension of a sewer or water system of an Authority, the Authority shall provide for reimbursement to the property owner when the owner of another

property not in the development for which the extension was constructed connects a service line directly to the extension within ten years of the date of the dedication of such extension to the Authority....

*Formerly* 53 P.S. § 306B(z.1).

◼ Nonetheless, the trial court concluded that Hornstein was not entitled to a waiver of the collection part-existing component because portions of the collection lines outside MPN serve both MPN residents and other users. Hornstein, however, contends that Section 4B(t)(1)(iii) was nonetheless applicable and, therefore, that the $2,550.00 collection part-existing component of the tapping fee should be deleted insofar as it has been applied to MPN.

In response, the Authority claims that it did not impose a collection component of the tapping fee upon Hornstein for the interior MPN collection system that he built. Rather, the Authority asserts that it imposed a collection fee for the interceptor and collector systems built by the Authority which are necessary to serve MPN.

With regard to Section 4B(z.1), the Authority points out that this provision was only applicable where a property owner outside the development connected a service line directly into the extension of a sewer system constructed by the developer within 10 years of the dedication of the extension to the Authority. As such, Section 4B(z.1) would have been applicable in the present case only if another developer had built a direct connection to the MPN extension constructed by Hornstein within 10 years of the date Hornstein dedicated the MPN extension to the Authority. Therefore, Section 4B(z.1) was inapplicable in this case.

Moreover, we agree with the trial court's interpretation of Section 4B(t)(1)(iii) of the 1945 Act as it applied to the facts of the case *sub judice*. In its

January 14, 2002 opinion, the trial court reasoned:

While it was true that Hornstein constructed an internal collection system, it was only part of the entire collection system for [the Township]. Residents of MPN will still have to use collection lines and the trunk line beyond the development for the effluent flow to the treatment plant. We found nothing in the [1945 Act] which required the Authority to "waive" the collection part as to Hornstein's development because he constructed the development's interior collection system. The fact that individuals who do not live in the development share and will share the lines outside the development with the development residents does not make waiver of the collection part of the tapping fees mandatory. These were the arguments of Hornstein and they had no merit.

The explanation given by the Authority's expert, Aurel Arndt, we believe, was the accurate interpretation of what [Section 4B(t)(1)(iii) ] requires. If a developer provided all of the collection facilities, then the collection component of the tapping fee must be waived. Hornstein has not provided all of the collection facilities. Short of that, there was discretion with the Authority as to whether there was a waiver. Because of the extent of development work done in the Township by Hornstein, this would appear to be a proper exercise of discretion. Granting the waiver urged by Hornstein would leave the Authority without the ability to recoup a significant portion of fees expended for this component.

Trial Court's January 14, 2002 Opinion at 10; R.R. 147a.

As the trial court aptly recognized, although Hornstein constructed MPN's interior collection system, MPN residents will

still need to use the interceptor and collector systems constructed by the Authority to convey sewage to the treatment plant. We conclude that these facilities constructed by the Authority fall within the meaning of "facilities necessary to supply service to the property owner or owners" in Section 4B(t)(1)(iii). Consequently, we reject Hornstein's contention that the trial court erred in upholding the Authority's imposition of the collection part-existing component of the tapping fee.

## IV.

■ Hornstein's fourth argument is that the trial court erred as a matter of law or abused its discretion in sustaining the Authority's imposition of a tapping fee following the expiration of a five-year moratorium and the adoption of the Authority's Connection Management Plan in 1998. Hornstein maintains that the Authority acted in bad faith by adopting the Connection Management Plan on June 30, 1998, prior to the expiration of the five-year moratorium on tapping fees contained in the Subdivision Agreement.

As noted above, under the Subdivision Agreement the parties agreed that Hornstein would be exempt from the payment of tapping fees for MPN from September 19, 1994 through September 19, 1999. The Connection Management Plan, however, limited the maximum number of sewer connections over a three-year period to 20 per year total and a maximum of 10 per year for any one development.

Hornstein claims that because of the limit of 10 permits per year, he was unable to obtain all the necessary permits for MPN prior to the expiration of the five-year moratorium on tapping fees. The trial court noted that at the time of the non-jury trial, 47 permits remained at issue inasmuch as 21 permits were still needed to complete the development of MPN and 26 permits that had been issued were subject to the $4,000.00 tapping fee. *See* Trial Court's January 14, 2002 Opinion at 7; R.R. 144a.

The trial court further noted, however, that the pace chosen by Hornstein also contributed to the non-completion of MPN prior to the expiration of the five-year moratorium. For example, Hornstein did not apply for the first permit for more than two years after the five-year period began to run. *Id.* at 8; R.R. 145a. In short, the trial court found that Hornstein could have made better use of the five-year moratorium than he did. *Id.* at 9; R.R. 146a.

The Authority contends that the delay in proceeding with the development of MPN was not created by the Authority and the fact that all necessary permits were not obtained prior to June 30, 1998 cannot be attributed to the Authority. The Authority points out that Hornstein did not apply for the first permits for Phase I of MPN until December 5, 1996, when five permits were issued. Hornstein then obtained six permits on January 4, 1997, 14 permits on March 24, 1997, four permits on May 4, 1998 and seven permits on June 23, 1998.

Moreover, the trial court determined that the Authority had a rational basis for the adoption of the Connection Management Plan on June 30, 1998. The trial court noted that even though the Authority's sewer system was licensed by the DEP to handle 80,000 gpd, the Authority had problems during certain times of the year when the sewage flow exceeded 60,000 gpd. *See Id.* at 9; R.R. 146a. The trial court further found that the Connection Management Plan was specifically designed to limit development in order not to exacerbate the problem. *Id.*

The record reflects that Hornstein and other Township developers were afforded

notice by the Authority of a June 30, 1998 special meeting regarding a projected hydraulic overload of the system which had been identified by the Authority. At the meeting, the Authority's engineer explained that the Authority's 1997 Wasteload Management Report, which was submitted to DEP in March 1998, projected that the Authority's treatment plant would be hydraulically overloaded by the year 2000. *See* Minutes of Authority's June 30, 1998 Special Meeting at 2; R.R. 463a.

The minutes of that meeting also reflect that the Authority determined "that it could take a minimum of three years to have additional wastewater treatment plant capacity on-line" and "that it is necessary to control the number of new connections to the sewer system on an annual basis so that development of the Township can continue while the planning, design, and construction of additional treatment capacity is accomplished." *Id.*

The Authority further determined "that new connections to the sewer system cannot exceed 20 per year for the next three years or until additional treatment capacity is provided" and that "[n]o more than 10 connections per year can come from any one development so as to evenly distribute the connections." *Id.* The Authority also determined that if there were connections remaining after October of a calendar year, they could be distributed to a development that had already been allocated its maximum allotment. *Id.*

Following receipt of the Authority's 1997 Wasteload Management Report, DEP advised the Authority by certified mail that the Authority must (1) submit a formal written plan outlining the measures to be taken to prevent the system from becoming overloaded and (2), limit new connections based upon the remaining available capacity. *See* DEP's August 21, 1998 Letter; R.R. 496a.

Nevertheless, Hornstein contends that because the Authority had approximately 26,000 gpd of available capacity during the time period the Connection Management Plan was in effect, it should have terminated the plan and allowed Hornstein to obtain the necessary permits for MPN at no charge under the terms of the Subdivision Agreement. Consequently, Hornstein asserts that the Authority breached its duty to review his development plans in good faith. *See Raum v. Bd. of Supervisors of Tredyffrin Tp.*, 29 Pa.Cmwlth. 9, 370 A.2d 777 (1976) (municipalities have a legal obligation to proceed in good faith in reviewing development plans).

We disagree. As reflected by the record, DEP required that the Authority (1) adopt a plan to prevent a hydraulic overload of its sewer system and (2) limit new connections of the system. Therefore, we agree with the trial court that the Authority had a rational basis, *i.e.,* a justifiable concern regarding a projected hydraulic overload of the sewer system, for adopting its Connection Management Plan.

Further, we note that the Connection Management Plan applied to all Township developers, not just Hornstein. As such, we reject Hornstein's contention that the Authority acted in bad faith in adopting its Connection Management Plan or that said Plan was an attempt to undermine Hornstein's rights under the Subdivision Agreement.

In view of the foregoing, we affirm the order of the trial court.

### ORDER

AND NOW, this 25th day of January, 2005, the September 24, 2003 order of the Court of Common Pleas of Lehigh County is hereby AFFIRMED.