# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Lycoming County Water and : 
Sewer Authority, : 
             Appellant : 
 : 
       v. : No. 1525 C.D. 2015
 : Argued: March 7, 2016
 : 
Valley Truck Ventures, LLC : 


BEFORE:    HONORABLE P. KEVIN BROBSON, Judge
                  HONORABLE JAMES GARDNER COLINS, Senior Judge
                  HONORABLE ROCHELLE S. FRIEDMAN, Senior Judge

OPINION NOT REPORTED

**MEMORANDUM OPINION BY**
**SENIOR JUDGE COLINS**                          **FILED:  June 29, 2016**


       Appellant Lycoming County Water and Sewer Authority (LCWSA) appeals the July 28, 2015 order of the Lycoming County Court of Common Pleas (Trial Court) that, *inter alia*, denied and dismissed the Authority's claim against Valley Truck Ventures, LLC (Valley Truck), for $3,200 in tapping fees[1] pursuant to the Municipal Claims and Tax Liens Act[2] (MCTLA).  The sole issue before this Court is whether LCWSA can charge Valley Truck a tapping fee for an additional 1 Equivalent Dwelling Unit (EDU) assessment for reserve capacity.  Based on the factual record giving rise to LCWSA's claim, we hold that LCWSA is prohibited

---

[1] In all other respects LCWSA prevailed.  Valley Truck was ordered to pay a total of $2,160.08 ($1,185 in sewer usage fees and penalties, $402.73 in collection costs, $172.35 in filing fees, and $400 for reasonable attorney fees).  (*See* Trial Court Order 7/28/15.)

[2] Act of May 16, 1923, P.L. 207, *as amended*, 53 P.S. §§ 7101-7505.

from assessing Valley Truck a tapping fee for an additional 1 EDU for reserve capacity and we affirm the order of the Trial Court.[3]

On October 28, 2004, Robert Roles (Former Owner) applied for connection to LCWSA's sewer system for property located in Muncy Township, identified as Lycoming County tax parcel No. 40-003-1040.2, with an address of 1825 John Brady Drive (Property). (Trial Court Op. at 1, 2-3.) Since the 1960s, the first floor of the Property contained garages and an office, and the second floor of the Property contained a residential unit. (*Id*. at 2.) The second floor of the Property has windows and the front door leading up to the apartment has a sign that states "apartment." (*Id*.) The Application for connection provided by LCWSA, under question 6, asked for the type (singular) of connection requested and provided boxes for: residential; multi-family; commercial; industrial; institutional; and other (explain: __). (*Id*. at 3; Application, Reproduced Record (R.R.) at 27a.) The application did not contain a box for "mixed use." (Trial Court Op. at 3; Application, R.R. at 27a.) The Former Owner listed the type of connection as "commercial" and requested 1.5 EDUs. (Trial Court Op. at 3; Application, R.R. at 27a).)

On November 8, 2004, a Sewer Lateral Inspector (Inspector) for LCWSA conducted an inspection of the Property. (Trial Court Op. at 3; Inspection Report, R.R. at 122a.) The Inspection Report utilized by LCWSA's Inspector, under question 9, asked "Are there any garages and/or apartments connected to the lateral sub? If yes, were the appropriate number of EDUs paid for?" (Trial Court Op. at 3; Inspection Report, R.R. at 122a.) The Inspector checked the box for "yes" next to question 9. (Trial Court Op. at 3; Inspection Report, R.R. at 122a.)

[3] The Trial Court filed an opinion with its July 25, 2015 order (Trial Court Op.) and an additional Rule 1925(a) opinion on October 22, 2015 (1925(a) Op.).

The Inspection Report, under question 7, further asked what type of connection the Property required and contained boxes for the following uses: residential; multi-family; commercial; industrial; institutional; or mixed. (Trial Court Op. at 3; Inspection Report, R.R. at 122a.) Question 7 also stated "if mixed, please describe." (Trial Court Op. at 3; Inspection Report, R.R. at 122a.) In answering question 7, the Inspector checked the box for "commercial." (Trial Court Op. at 3; Inspection Report, R.R. at 122a.) Following the inspection, the Property was connected to the LCWSA sewer system and assessed 1.5 EDUs. (Trial Court Op. at 3.)

On April 21, 2011, Valley Truck purchased the Property. (*Id*. at 2.) In the fall of 2013, LCWSA sent property owners an "EDU Assessment Report To Determine and/or Verify EDU Assignment for Your Property." (*Id*. at 3; EDU Assessment Report, R.R. at 23a.) Unlike the 2004 Application, the 2011 form did not contain check boxes to determine the type of connection and instead stated "Property Use (residential rentals, office, retail, restaurant, combination etc.) ____." (Trial Court Op. at 3; EDU Assessment Report, R.R. at 23a.) Valley Truck circled the word "combination" and wrote in "Garage & Residential" on the property use section of the form. (Trial Court Op. at 3; EDU Assessment Report, R.R. at 23a.) On December 17, 2013, LCWSA increased the EDU assessment of the Property from 1.5 EDUs to 2.5 EDUs. (Trial Court Op. at 3; Increase Letter, R.R. at 24a.) The reason given for the increase was a change in use "per section 6.1.5[4] of our Rules and Regulations…based upon the fact that this property

---

[4] LCWSA's regulations provide in Section 6.1.5: "Classification and Equivalent Dwelling Units – The Classification and Equivalent Dwelling Unit for each type of property (category) service by the Authority shall be as follows" and then lists different categories and EDUs for each. (R.R. at 48a.) For the category of "apartment house (per each family unit)" 1 EDU is listed; for the category of "Retail Store, Business, Industry or Office not attached to or forming a part of

3

consists of two businesses, one of which doubles as a residential unit." (Trial Court Op. at 3; Increase Letter, R.R. at 24a.) LCWSA also sent Valley Truck an invoice for $3,500 for a "tap-fee – MRSS."[5] (Trial Court Op. at 3; Invoice, R.R. at 25a.)

Valley Truck refused to pay the tapping fee. (Trial Court Op. at 3-4.) On October 20, 2014, LCWSA filed a praecipe for writ of scire facias pursuant to the authority provided by the MCTLA. On November 3, 2014, Valley Truck filed an affidavit of defense.[6] *See* Section 14, 53 P.S. § 7182 (Petition of Defendant).

_____

owner's residence/property" 1.5 EDUs is listed for 10 employees or fewer, with .5 EDUs for each additional 10 employees or fraction thereof. (R.R. at 49a.)

[5] LCWSA also increased the monthly usage charge. The increased charge for usage is not at issue.

[6] In *GSP Management Co. v. Duncansville Municipal Authority*, 126 A.3d 369 (Pa. Cmwlth. 2015), we reviewed the history of a writ of scire facias and the procedure applicable under the MCTLA, stating:

> Scire facias is a "judicial writ, founded upon some matter of record, such as a judgment or recognizance and requiring the person against whom it is brought to show cause why the party bringing it should not have advantage of such record." The Latin term is used to designate both the writ and the whole proceeding. Black's Law Dictionary 1346 (6th ed.1990). "The object of the writ of scire facias is ordinarily to ascertain the sum due on a lien of record and to give the defendant an opportunity to show cause why the plaintiff should not have execution." *Western Clinton County Municipal Authority v. Estate of Rosamilia*, 826 A.2d 52, 56 (Pa. Cmwlth. 2003) (*Estate of Rosamilia*). In *Estate of Rosamilia*, we outlined the ordinary process, as provided in what is commonly referred to as the [MCTLA]:
>
>> In Pennsylvania, municipal claim procedure in general and scire facias procedure in particular, is purely statutory. Once the municipality files a claim for services, the claim becomes a lien on the property. If the owner does not dispute the claim and assessment, the owner simply pays and removes the lien. To contest the claim or amount of

4

On January 29, 2015, LCWSA filed a motion for judgment for want of sufficient affidavit of defense pursuant to Section 19 of the MCTLA and on February 26, 2015, LCWSA filed a motion for judgment on the whole record pursuant to Section 20 of the MCTLA.[7] On March 12, 2015, the Trial Court heard argument

---

> assessment and to force the issue to an original hearing, the owner may file and serve a notice upon the claimant municipality to issue a writ of scire facias. In the proceeding commenced by the writ of scire facias, the owner then files an "affidavit of defense." In that affidavit the owner may raise all defenses he or she has to the municipal claim.
>
> Alternatively, the municipality may pursue a writ of scire facias without waiting for prompting by the owner, which is what occurred in the present case. In response to the writ, the owner may file an affidavit of defense raising all defenses.
>
> ....[T]he existence of a local administrative procedure for contesting sewer bills does not alter the statewide statutory scheme for municipal claims and writs of scire facias.
>
> *Estate of Rosamilia*, 826 A.2d at 56 (citations omitted).

*GSP Management*, 126 A.3d at 373 n.1.

[7] Section 19 of the MCTLA provides:

> If no affidavit of defense be filed within the time designated, judgment may be entered and damages assessed by the prothonotary by default, for want thereof. Such assessment shall include a fee for collection to plaintiff's attorney in accordance with section 3 [53 P.S. § 7106].
>
> If an affidavit of defense be filed, a rule may be taken for judgment for want of sufficient affidavit of defense, or for so much of the claim as is insufficiently denied, with leave to proceed for the residue.
>
> The defendant may, by rule, require the plaintiff to reply, under oath or affirmation, to the statements set forth in the affidavit of

on the motions. On March 13, 2015, the Trial Court ordered an evidentiary hearing to address facts raised at argument that did not appear on the record and the hearing was held on April 9, 2015. (Trial Court Op. at 2; Hearing Transcript (H.T.), R.R. at 72a.)

Following the hearing, the Trial Court concluded that Valley Truck had raised sufficient issues in its affidavit of defense to challenge the reasonableness of the tapping fees. (Trial Court Op. at 6.) The Trial Court held that there had not been a change in use at the Property since the original connection in 2004 and that equity demanded that Valley Truck not be held responsible for LCWSA's failure to determine the proper usage for the Property at the time of connection. (*Id.*) LCWSA appealed to this Court for review of the Trial Court's dismissal of the tapping fee assessed on December 17, 2013.[8]

---

defense, and after the replication has been filed may move for judgment on the whole record.

53 P.S. § 7271. Section 20 provides:

> Tax claims and municipal claims shall be prima facie evidence of the facts averred therein in all cases; and the averments in both tax and municipal claims shall be conclusive evidence of the facts averred therein, except in the particulars in which those averments shall be specifically denied by the affidavit of defense, or amendment thereof duly allowed. A compulsory nonsuit, upon trial, shall be equivalent to a verdict for defendant, whether the plaintiff appeared or not. If plaintiff recovers a verdict, upon trial, in excess of the amount admitted by the defendant in his affidavit of defense or pleadings, he shall be entitled to reasonable attorney fees for collection in accordance with [53 P.S. § 7106].

53 P.S. § 7187.

[8] This Court's scope of review of a trial court's order striking a municipal claim is limited to determining whether constitutional rights were violated, whether an error of law was committed, and whether the trial court abused its discretion. *Penn Township v. Hanover Foods Corp.*, 847 A.2d 219, 221 (Pa. Cmwlth. 2004).

LCWSA argues that under Section 5607(d)(24)(i)(C)(I) of the Municipality Authorities Act[9] (Act) it has authority to assess tapping fees at those times it deems necessary and it has the right to charge additional tapping fees against existing customers for their increased capacity requirements. 53 Pa C.S. § 5607(d)(24)(i)(C)(I). In accordance with this authority, LCWSA argues that it has the right to assess for additional EDUs upon being provided with "additional information" concerning usage at a property. LCWSA argues that it must be able to assess and revise EDUs based upon self-reporting. It contends that the Trial Court's holding requires regular on-site inspection, which creates an undue burden on LCWSA to inspect properties throughout its rural service area to determine if there has been a change in use. LCWSA argues that it is a property owner's burden at the time of purchase to ensure that the assessment and the use of the property align. LCWSA further contends that the responsibility for payment of tapping fees should lie with the party benefiting from use of the sewer system.

Valley Truck contends that the record is clear that a change in use did not take place at the Property and therefore LCWSA could not charge a tapping fee for a change in use. Valley Truck essentially contends that it is an innocent owner of the Property and should not be held to account for the Former Owner's failure to pay the appropriate tapping fee at the time of connection or for LCWSA's failure to ensure that the Property was properly assessed at the time of connection. Valley Truck also argues that the Trial Court followed the proper procedure by holding a hearing to determine the appropriate amount of the lien filed by LCWSA.

In its Rule 1925(a) opinion, the Trial Court states that the tapping fee was assessed despite the fact that there was no application for connection or

---

[9] 53 Pa C.S. §§ 5601-5623.

additional use and no change in use at the Property since the original connection. (1925(a) Op. at 2.) The Trial Court reviewed its findings, noting that LCWSA did not inquire about usage at the Property for 9 years and then upon receiving Valley Truck's self-report in the form of the EDU Assessment Report, incorrectly determined that there had been a change in use at the Property. (*Id*. at 3.) The Trial Court found that there was no evidence of deception in the initial application to connect by the Former Owner of the Property. (*Id*. at 3-4) In addition, the Trial Court found that use of the Property was apparent by looking at the building and that the residential use was open and notorious at the time the Property was originally connected to LCWSA's sewer system. (*Id*. at 4, 5.) The Trial Court concluded that its ruling does not create a burden on LCWSA to engage in regular site inspections of its service properties, but to inspect a property at or about the time of connection, to request the specific information necessary to make the correct assessment at the time of connection, and to rely on self-reporting going forward, which is precisely the procedure currently followed. (*Id*. at 4-5.) The Trial Court noted that its holding was fact specific. (*Id*. at 4.) Finally, the Trial Court concluded that LCWSA had waived its right to challenge the Trial Court's ruling in equity because LCWSA had argued that equity favored LCWSA, rather than that this was a pure matter of law. (*Id*. at 5.)

Initially, we must agree with the Trial Court's conclusion that the issue before this Court is not a pure question of law. The legal issues arising from disputes over tapping fees that have previously been appealed to this Court are distinct from the issue here and generally fall into one of three categories: (i) disputes over privately constructed sewers turned over to a sewer authority, *see, e.g., Hornstein Enterprises, Inc. v. Township of Lynn*, 634 A.2d 704 (Pa. Cmwlth.

8

1993); (ii) disputes over the amount of a tapping fee, *see, e.g., Citizens Against Unfair Treatment, by Michael v. Scott, Township*, 616 A.2d 756 (Pa. Cmwlth. 1992); and (iii) disputes over the method used to determine the amount of a tapping fee, *see, e.g., West v. Hampton Township Sanitary Authority*, 661 A.2d 459 (Pa. Cmwlth. 1995). There is no precedent directly addressing the issue before this Court. Furthermore, while the Act discusses LCWSA's rights and powers, including its right to assess for capacity, the statutory language contained in the Act does not support LCWSA's argument that the issue before us can be resolved on a purely legal basis.

Section 5607 of the Act defines the purposes of the Act and the powers provided to the municipalities and authorities covered by the Act. 53 Pa C.S. § 5607. Subsection (d) details rights and powers specific to sewer authorities. 53 Pa. C.S. § 5607(d). Paragraph (24) of subsection (d) details the power:

> To charge enumerated fees to property owners who desire to or are required to connect to the authority's sewer or water system. Fees shall be based upon the duly adopted fee schedule which is in effect at the time of payment and shall be payable at the time of application for connection or at a time to which the property owner and the authority agree. In the case of projects to serve existing development, fees shall be payable at a time to be determined by the authority. An authority may require that no capacity be guaranteed for a property owner until the tapping fees have been paid or secured by other financial security. The fees shall be in addition to any charges assessed against the property in the construction of a sewer or water main by the authority under paragraphs (21) and (22) as well as any other user charges imposed by the authority under paragraph (9), except that no reservation of capacity fee or other similar charge shall be imposed or collected from a property owner who has applied for service unless the charge is

9

based on debt and fixed operating expenses. A reservation of capacity fee or other similar charge may not exceed 60% of the average sanitary sewer bill for a residential customer in the same sewer service area for the same billing period. Any authority opting to collect a reservation of capacity fee or other similar charge may not collect the tapping fee until the time as the building permit fee is due. Tapping fees shall not include costs included in the calculation of any other fees, assessments, rates or other charges imposed under this act.

53 Pa. C.S. § 5607(d)(24). Within paragraph (24), subparagraph (i) states that "fees may include any of the following if they are separately set forth in a resolution adopted by the authority." 53 Pa. C.S. § 5607(d)(24)(i). One of the fees listed under subparagraph (i) of paragraph (24) is tapping fees. 53 Pa. C.S. § 5607(d)(24(i)(C). Section 5607(d)(24)(i)(C) provides:

> Tapping fee. A tapping fee shall not exceed an amount based upon some or all of the following parts which shall be separately set forth in the resolution adopted by the authority to establish these fees. In lieu of payment of this fee, an authority may require the construction and dedication of only such capacity, distribution-collection or special purpose facilities necessary to supply service to the property owner or owners.

53 Pa. C.S. § 5607(d)(24)(i)(C). Subclause (I) further provides:

> (I) Capacity part. The capacity part shall not exceed an amount that is based upon the cost of capacity-related facilities, including, but not limited to, source of supply, treatment, pumping, transmission, trunk, interceptor and outfall mains, storage, sludge treatment or disposal, interconnection or other general system facilities. Except as specifically provided in this paragraph, such facilities may include only those that provide existing service.

10

The cost of capacity-related facilities, excluding facilities contributed to the authority by any person, government or agency, or portions of facilities paid for with contributions or grants other than tapping fees, shall be based upon their historical cost trended to current cost using published cost indexes or upon the historical cost plus interest and other financing fees paid on debt financing such facilities. To the extent that historical cost is not ascertainable, tapping fees may be based upon an engineer's reasonable written estimate of current replacement cost. Such written estimate shall be based upon and include an itemized listing of those components of the actual facilities for which historical cost is not ascertainable. Outstanding debt related to the facilities shall be subtracted from the cost except when calculating the initial tapping fee imposed for connection to facilities exclusively serving new customers. The outstanding debt shall be subtracted for all subsequent revisions of the initial tapping fee where the historical cost has been updated to reflect current cost except as specifically provided in this section. For tapping fees or components related to facilities initially serving exclusively new customers, an authority may, no more frequently than annually and without updating the historical cost of or subtracting the outstanding debt related to such facilities, increase such tapping fee by an amount calculated by multiplying the tapping fee by the weighted average interest rate on the debt related to such facilities applicable for the period since the fee was initially established or the last increase of the tapping fee for such facilities. The capacity part of the tapping fee per unit of design capacity of said facilities required by the new customer shall not exceed the total cost of the facilities as described herein divided by the system design capacity of all such facilities. Where the cost of facilities to be constructed or acquired in the future are included in the calculation of the capacity part as permitted herein, the total cost of the facilities shall be divided by the system design capacity plus the additional capacity to be provided by the facilities to be constructed or acquired in

11

the future. An authority may allocate its capacity-related facilities to different sections or districts of its system and may impose additional capacity-related tapping fees on specific groups of existing customers such as commercial and industrial customers in conjunction with additional capacity requirements of those customers. The cost of facilities to be constructed or acquired in the future that will increase the system design capacity may be included in the calculation of the capacity part, subject to the provisions of clause (VI)….

53 Pa. C.S. § 5607(d)(24)(i)(C)(I).

In advancing its argument, LCWSA emphasizes the following language from Section 5607 of the Act. Under paragraph (d)(24), LCWSA focuses on its right "[t]o charge enumerated fees to property owners who desire to or are required to connect to the authority's sewer or water system." 53 Pa C.S. 5607(d)(24). LCWSA also highlights the language in this section that states "[i]n the case of projects to serve existing development, fees shall be payable at a time to be determined by the authority," and "[t]he fees shall be in addition to any charges assessed against the property in the construction of a sewer or water main…" *Id.* Under subclause (d)(24)(i)(C)(I), which addresses capacity part, LCWSA focuses on this language near the end of the provision: "[a]n authority may allocate it capacity-related facilities to different sections or districts of its system and may impose additional capacity-related tapping fees on specific groups of existing customers in conjunction with additional capacity requirements of those customers." 53 Pa. C.S. § 5607(d)(24)(i)(C)(I).

The bulk of the statutory language addresses the initial construction of and connection to a sewer system. It is clear under the extensive statutory language contained in the Act and the particular language emphasized by LCWSA

12

that LCWSA has authority to charge for reserve capacity; moreover, there is no question that LCWSA has the ability to charge Valley Truck for its use of the system and that Valley Truck is responsible for payment in exchange for its use of the sewer system. However, the language in the Act does not address the specific factual situation here. At the time of the application for connection, the Former Owner paid for connection and reserve capacity. The use of the Property has not changed; therefore, the Property does not fall within the category of existing customers that require and can be charged for additional capacity. LCWSA contends that "additional information" is akin to "additional use" and that, although there was no change in use, the change in information concerning use was sufficient to trigger its authority to assess for additional capacity. The language of the Act does not support LCWSA's position.

As a result of the lack of common and statutory law addressing whether a sewer authority can charge an innocent owner where there has been no change in use at the property but the use was incorrectly assessed during the original connection, LCWSA focuses on the Trial Court's factual findings and conclusion that its ruling did not create an undue burden on LCWSA.

LCWSA's argument regarding the Trial Court's factual findings focuses on the Former Owner's Application and the Inspection Report. Neither the Former Owner nor the Inspector testified before the Trial Court. The Operations Manager for LCWSA did testify, but she did not work for LCWSA in 2004 and could not testify to the procedures followed by LCWSA prior to her tenure. (H.T. at 3-8 (direct), 8-12 (cross), 12-13 (re-direct), R.R. at 74a-83a.) LCWSA contends that the Trial Court ignored the section of the Application that provided "other__" as one of the options for use and that because of the option of "other__", the

13

absence of "mixed use" as an option for type of use is of no moment. LCWSA did not address the Trial Court's finding that the form requested a description of the "type" of use rather than "types" of use. Similarly, LCWSA contends that checking "yes" on the Inspection Report for the question "Are there any garages and/or apartments connected to the lateral sub? If yes, were the appropriate number of EDUs paid for?" is determinative of nothing because the appropriate number of EDUs were not paid for and the Property contains garages, which would have required the "yes" box to be checked regardless of whether the Inspector was aware of the apartment or not. LCWSA is correct that the evidence in this case could be interpreted in multiple ways; however, the Trial Court weighed the evidence and made specific findings that were detrimental to LCWSA's case. LCWSA's argument amounts to a disagreement with the weight afforded the evidence, rather than an absence of supporting evidence, and ultimately, its argument serves merely to highlight the Trial Court's proper functioning in its role as fact finder, rather than an abuse of discretion that would require reversal by this Court.

In its brief, LCWSA states "[a]t the hearing, Appellee Valley Truck conceded that there is no authority in support of tipping the balance of the equities in this case in its favor." (LCWSA Brief at 24.) This is true for LCWSA as well. Before this Court, LCWSA argues that the presumption of regularity of Section 20 of the MCTLA, which provides "Tax claims and municipal claims shall be *prima facie* evidence of the facts averred therein in all cases," should tip the equities in its favor. 53 P.S. § 7187. Section 20 of the MCTLA, however, provides an exception; the statute continues "and the averments in both tax and municipal claims shall be conclusive evidence of the facts averred therein, except in the

14

particulars in which those averments shall be specifically denied by the affidavit of defense, or amendment thereof duly allowed." *Id.*

Here, the Trial Court found that the affidavit of defense did specifically deny the propriety of the "tapping fee." In *Borough of Fairview v. Property Located at Tax Index No. 48-67-4*, 453 A.2d 728 (Pa. Cmwlth. 1982), this Court noted that an "affidavit of defense to a scire facias sur municipal lien claim must be certain and definite." *Id.* at 730 n.3. In *Borough of Fairview*, the defense merely stated bald allegations that the property was improperly assessed because it was not benefitted. *Id.* at 729. Here, the affidavit of defense clearly states that the former owner is liable for any "tapping fees" and that it was improper to assess Valley Truck. Under these circumstances, the MCTLA does not grant LCWSA a presumption that the "tapping fee" was correctly assessed.

LCWSA's argument that the Trial Court's holding creates an undue burden is not persuasive. The Trial Court's holding does not apply to properties where there has been an actual change in use. There is no question under the Act that LCWSA or another similarly situated authority can charge a tapping fee based on reserve capacity when additional uses are added to a property and when additional properties are added to the system. The Trial Court's opinion does not alter the status quo, which depends upon a site inspection following an application and then self-reporting of any change in use. Instead, the Trial Court's opinion is limited to this fact-specific instance.

Accordingly, the Trial Court did not abuse its discretion or err as a matter of law; therefore, we affirm the order of the Trial Court.

_____
**JAMES GARDNER COLINS, Senior Judge**

15

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Lycoming County Water and  
Sewer Authority,  
                Appellant

           v.

Valley Truck Ventures, LLC

:
:
:
:
:
: No. 1525 C.D. 2015
:
:
:

# ORDER

AND NOW, this 29th day of June, 2016, the order of Lycoming County Court of Common Pleas in the above-captioned matter striking Lycoming County Water and Sewer Authority's lien for $3,500 in tapping fees is AFFIRMED.

**_____**

**JAMES GARDNER COLINS, Senior Judge**