IN THE COMMONWEALTH COURT OF PENNSYLVANIA

J. Buchanan Associates, LLC,       :
           Appellant      :
                         :   No.  261 C.D. 2019
           v.            :
                         :   Argued:  December 10, 2019
University Area Joint Authority   :


BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE ANNE E. COVEY, Judge
                HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


OPINION BY
JUDGE McCULLOUGH                    FILED:  May 13, 2020


       J. Buchanan Associates, LLC (Buchanan) appeals from the February 28, 2019 order of the Court of Common Pleas of Centre County (trial court), which sustained the University Area Joint Authority's (Authority) preliminary objections and dismissed Buchanan's first amended class action complaint.  We affirm.


**<u>Introduction</u>**

       The Authority is a joint municipal sewer authority formed under the Municipality Authorities Act (MAA), 53 Pa.C.S. §§5601-5623.  When a new residential or commercial customer desires (or is required) to connect to a municipal authority's sewer system, the municipal authority is authorized, pursuant to the MAA, to charge a "tapping fee" to recoup its capital costs incurred in constructing the particular facilities required to provide service to the new customer.  The tapping fee is a one-time charge for access to the sewer system; it is not to be confused with a user fee, which is a separate ongoing charge for actual use of the system.

Buchanan owns a 20,260-square-foot office building known as the Buchanan Center in State College, Pennsylvania. In December 2015, Buchanan submitted an application to connect Buchanan Center to the Authority's sanitary sewer system. The Authority charged Buchanan a $32,977 tapping fee, which was the equivalent of seven times the tapping fee for a single residential dwelling, measured in Equivalent Dwelling Units (EDUs).[1] That is, the Authority used a residential unit, i.e., an EDU, as the standard unit for measuring units of discharge, and converted Buchanan Center's estimated sewage flow into EDUs. Buchanan disagreed with the amount of the tapping fee, but paid it under protest and connected to the system. Whether Buchanan has sufficiently stated a claim for relief against the Authority for violation of the MAA's tapping fee provisions is the subject of this appeal.[2]

**Statutory Background for Charging Tapping Fees**

Section 5607 of the MAA governs municipal authorities' "Purposes and Powers," and provides, in pertinent part:

> (d) Powers.--Every authority may exercise all powers necessary or convenient for the carrying out of the purposes

---

[1] An "equivalent dwelling unit" (EDU) is a unit of measurement for volume of sewage flow, and typically one EDU will correspond to one residence. *The Ainjar Trust v. Department of Environmental Protection*, 806 A.2d 482, 484 (Pa. Cmwlth. 2002).

[2] In an appeal from an order sustaining preliminary objections in the nature of a demurrer, we are constrained to examine only those well-pleaded facts in the complaint, since a demurrer admits those facts and any inferences reasonably deducible therefrom, for purposes of such a determination. *Robinson v. Department of Justice, Bureau of Corrections*, 377 A.2d 1277 (Pa. Cmwlth. 1977). In that examination, we bear in mind that dismissal of a complaint on preliminary objections should occur only in cases which are clear and free from doubt. *Legman v. School District of the City of Scranton*, 247 A.2d 566 (Pa. 1968). Any reservation relative to the legal possibility of recovery should be resolved by refusing to sustain the demurrer. *Allstate Insurance Company v. Fioravanti*, 299 A.2d 585 (Pa. 1973).

set forth in this section, including, but without limiting the generality of the foregoing, the following rights and powers:

* * *

(9) to fix, alter, charge and collect rates and other charges in the area served by its facilities at reasonable and uniform rates to be determined exclusively by it for the purpose of providing for the payment of the expenses of the authority, the construction, improvement, repair, maintenance and operation of its facilities and properties. . . .

* * *

(24) To charge enumerated fees to property owners who desire to or are required to connect to the authority's sewer or water system.

* * *

(i) The fees may include any of the following if they are separately set forth in a resolution adopted by the authority:

* * *

(C) Tapping fee.

53 Pa.C.S. §5607(d)(9), (24).[3]

A tapping fee may be comprised of up to four components, only two of which are relevant in this appeal: the "Capacity part" and the "Collection part." 53

---

[3] Permissible fees also include: a connection fee and a customer facilities fee. 53 Pa.C.S. §5607(d)(24)(i)(A), (B). Only the tapping fee is relevant to this appeal.

3

Pa.C.S. §5607(d)(24)(i)(C)(I), (II).[4] As applicable here, section 5607(d)(24)(i)(C) of the MAA addresses the requirements relating to the computation of the Capacity and Collection parts of the tapping fee:

> (C) Tapping fee. A tapping fee shall not exceed an amount based upon some or all of the following parts which shall be separately set forth in the resolution adopted by the authority to establish these fees . . .
>
> > (I) Capacity part. The capacity part shall not exceed an amount that is based upon the cost of capacity-related facilities, including, but not limited to, source of supply, treatment, pumping, transmission, trunk, interceptor and outfall mains, storage, sludge treatment or disposal, interconnection or other general system facilities. . . . The cost of capacity-related facilities . . . shall be based upon their historical cost trended to current cost using published cost indexes or upon the historical cost plus interest and other financing fees paid on debt financing such facilities. . . . Outstanding debt related to the facilities shall be subtracted from the cost. . . .The capacity part of the tapping fee per unit of design capacity of said facilities required by the new customer shall not exceed the total cost of the facilities as described herein divided by the system design capacity of all such facilities. . . .
> >
> > (II) Distribution or collection part. The distribution or collection part may not exceed an amount based upon the cost of distribution or collection facilities required to provide service, such as mains, hydrants and pumping stations. .

---

[4] The tapping fee may also be based on a special purpose part and a reimbursement part, neither of which are relevant for purposes of this appeal. *See* 53 Pa.C.S. §5607(d)(24)(i)(C)(III)-(IV).

. . The cost of distribution or collections facilities . . . shall be based upon historical cost trended to current cost using published cost indexes or upon the historical cost plus interest and other financing fees paid on debt financing such facilities. . . . Outstanding debt related to the facilities shall be subtracted from the cost. . . . The distribution or collection part of the tapping fee per unit of design capacity of said facilities required by the new customer shall not exceed the cost of the facilities divided by the design capacity. . . .

53 Pa.C.S. §5607(d)(24)(i)(C)(I)-(II).

### Act 57 of 2003

In December 2003, the MAA was amended by the Act of December 30, 2003, P.L. 404, No. 57 (Act 57). Relevant to this appeal, Act 57 made the following changes. It established the maximum "design capacity"[5] that a municipal authority may allot to a new residential customer when calculating that customer's tapping fee:

[T]he design capacity required by a new residential customer used in calculating sewer or water tapping fees shall not exceed an amount established by multiplying . . . 90 gallons per capita per day for sewer capacity times the average number of persons per household as established by the most recent census data provided by the United States Census Bureau.

53 Pa.C.S. §5607(d)(24)(i)(C)(V)(e).

---

[5] "Design capacity" refers to the wastewater requirements of a customer. "System design capacity" refers to the maximum wastewater capacity of the municipal authority's sewer facility. *See* p.6, *infra.*

Pursuant to Act 57's amendments to section 5607(d)(24)(ii), any authority charging a tapping fee may only do so pursuant to a resolution adopted at a public meeting. Section 5607(d)(24)(ii) of the MAA now reads:

> (ii) Every authority charging a tapping, customer facilities or connection fee shall do so **only pursuant to a resolution adopted** at a public meeting of the authority. The authority shall have available for public inspection a detailed itemization of all calculations, clearly showing **the maximum fees allowable for each part of the tapping fee and** the manner in which the fees were determined, **which shall be made a part of any resolution imposing such fees.** A tapping, customer facilities or connection fee may be revised and imposed upon those who (sic) subsequently connect to the system, **subject to the provisions and limitations of the act.**

53 Pa.C.S. §5607(d)(24)(ii) (emphasis added).[6]

Act 57 also added several definitions for use in section 5607(d)(24) of the MAA, including the following definitions for "design capacity" and "system design capacity":

> "Design capacity." For residential customers, the permitted or rated capacity of facilities expressed in million gallons per

---

[6] The highlighted portions were added by Act 57. Notably, the basis for the requirement that municipalities adopt tapping fees at a public meeting and make available for public inspection a detailed itemization of all calculations showing the manner in which the fee is calculated is not new. It can be traced back to the Act of December 19, 1990, P.L. 1227, No. 203, *as amended* (Act 203 of 1990), which amended the former MAA. *See generally West v. Hampton Township Sanitary Authority*, 661 A.2d 459 (Pa. Cmwlth. 1995). Act 57 added the requirements that (1) the tapping fee be adopted by "resolution"; (2) the authority have available for public inspection a detailed itemization of all calculations which include "the maximum fees allowable for each part of the tapping fee"; and (3) the detailed itemization "be made part of any resolution imposing such fee." 53 Pa.C.S. §5607(d)(24)(ii).

day.  For nonresidential customers, design capacity may also be expressed in pounds of BOD5 [five-day biochemical oxygen demand] per day, pounds of suspended solids per day or any other capacity-defining parameter that is separately and specifically set forth in the permit governing the operation of the system and based upon its original design as modified by those regulatory agencies having jurisdiction over these facilities.  Additionally, for separate fire service customers, the permitted or rated capacity of fire service facilities may be expressed in peak flows. The units of measurement used to express design capacity shall be the same units of measurement used to express the system design capacity.  **Except as otherwise provided for special purpose facilities, design capacity may not be expressed in terms of equivalent dwelling units**.[7]

\*\*\*

"System design capacity."  The design capacity of the system for which the tapping fee is being calculated which represents the total design capacity of the treatment facility or water sources.

53 Pa.C.S. §5607(d)(24)(i)(C)(VII) (emphasis added).


### The Authority's 2005 Capital Charges Study[8]

In 2005, in response to Act 57, the Authority commissioned a Capital Charges Study by an engineering firm, Herbert, Rowland & Grubic, Inc. (HRG), to determine, *inter alia*, the Capacity and Collection parts of the maximum allowable

---

[7] As discussed *infra*, Buchanan relies heavily on this sentence to support its position that the Authority was precluded from utilizing an EDU-based method of charging its tapping fee.

[8] The 2005 Capital Charges Study is attached to the Amended Complaint as Exhibit "G."

tapping fee that Authority could charge its customers.[9] (Amended Complaint, ¶ 30, Reproduced Record (R.R.) at 51a-70a.)

HRG began with the fixed starting point that the Authority's system design capacity (how much wastewater its facilities can handle) was 6,750,000 gallons of wastewater per day. (R.R. at 53a.) Applying the requirements of section 5607(d)(24)(i)(C) of the MAA, as set forth above, HRG concluded that the maximum tapping fee the Authority could charge a residential customer was $4,636.93 based on: (1) the Capacity part - $3,640.96, and (2) the Collection part - $995.98. *Id.* Specifically, in determining the Capacity part of the tapping fee, HRG trended the capital costs associated with construction of the Authority's capacity-related facilities to 2005 ($170,149,012.51).[10] (R.R. at 57a.) HRG reduced that amount by the amount of the Authority's outstanding debt ($65,506,007). *Id.* That amount ($104,643,005) was divided by 6,750,000 gallons per day, *i.e.*, the Authority's system design capacity. *Id.* That calculation yielded the Authority's "Cost per Unit of Design Capacity" of $15.50 per gallon for the Capacity part of the tapping fee. *Id.*

Next, HRG determined Act 57's maximum allowable design capacity for a residential connection by multiplying 90 gallons per day by the average number of

---

[9] Buchanan does not argue that HRG's 2005 Capital Charges Study was not adopted at a public meeting or that it otherwise violates the requirements of section 5607(d)(24)(ii) of the MAA, as set forth above. 53 Pa.C.S. §5607(d)(24)(ii). However, as discussed *infra*, Buchanan argues that a rate resolution adopted by the Authority in 2015, which revised its tapping fees, violates this section.

[10] A municipal authority's cost per unit of the sewer system's capacity and collection-related facilities are computed by using one of the following approaches: (1) historical costs trended to current cost; (2) historic costs plus cost of financing; or (3) replacement cost. 53 Pa.C.S. §5607(d)(24)(i)(C)(I) and (II). In this case, the Authority's engineers used the historical cost trended to current costs method to determine the costs of the capacity and collection related facilities. The Authority's methodology for calculating the cost factor is not at issue here.

8

persons per household as determined by the 2000 census statistic of 2.61 persons per household in Centre County (90 x 2.61 = 234.9).[11]  *Id.*

HRG then multiplied the Authority's Cost per Unit of Design Capacity for its capacity facilities ($15.50 per gallon per day) by Act 57's maximum allowable design capacity for a residential connection ("**No. Units of Design Capacity" also expressed in gallons per day**)[12] to determine the Capacity part of the tapping fee for residential customers ($15.50 per gallon per day x 234.9 gallons per day = $3,640.95). *Id.* HRG performed a similar calculation to determine the Collection part of the tapping fee, using the cost of the collection facilities.  (R.R. at 62a-63a.)  The calculation was the same as the Capacity part calculation—except instead of beginning the formula with the cost of the Authority's capacity-related facilities, the cost of the Authority's collection-related facilities was used.  *Id.*  HRG computed the total maximum residential tapping fee by adding together the Capacity part and the Collection part, as outlined above.  (R.R. at 53a.)  HRG's complete calculation of a residential tapping fee, which was appended to the 2005 Capital Charges Study as "Exhibit 3," is set forth below:

---

[11] As noted, Act 57 sets the maximum design capacity per residential connection.  The design capacity for a single-family dwelling cannot be more than 90 gallons of wastewater per day times the average number of persons per household as established by the most recent census data provided by the U.S. Census Bureau.  *See* 53 Pa.C.S. §5607(d)(24)(i)(C)(V)(e).

[12] We emphasize this part of the complex calculation for ease of reference because it is important to our discussion below.



**Exhibit 3 - Calculation of Tapping Fee**

CAPACITY PART

$$\frac{\text{Trended Cost} - \text{Debt}}{\text{Design Capacity (gallons per day)}} = \text{Cost per Unit of Design Capacity}$$

$$\frac{\$ 170,149,012.51 - \$65,506,007.00}{6,750,000} = \$ \quad 15.50$$

| Cost per Unit | X | No of Units of Design Capacity | = | Tapping Fee/ Domestic Unit |
|---|---|---|---|---|
| $ 15.50 | X | 234.90 | = $ | 3,640.95 |

COLLECTION PART

$$\frac{\text{Trended Cost} - \text{Debt}}{\text{Design Capacity (gallons per day)}} = \text{Cost per Unit of Design Capacity}$$

$$\frac{\$ 28,627,827.08 - \$ \quad \cdot}{6,750,000} = \$ \quad 4.24$$

| Cost per Unit | X | No of Units of Design Capacity | = | Tapping Fee/ Domestic Unit |
|---|---|---|---|---|
| $ 4.24 | X | 234.90 | = $ | 995.98 |

TOTAL FEE
$ 4,636.93

(R.R. at 70a.)

For non-residential customers, HRG assessed the tapping fee based on a per/gallon basis, as follows:

$15.50 Capacity part + $4.24 Collection part = tapping fee of $**19.74** per gallon per day

(R.R. at 53a.)

### The Authority's 2015 Rate Resolution[13]

On June 30, 2015, the Authority adopted a Rate Resolution (2015 Rate Resolution), which revised, among other things, its sewer tapping fees. (Amended

---

[13] The Authority's 2015 Rate Resolution is attached to the Amended Complaint as Exhibit "F."

Complaint, ¶¶ 18-20, R.R. at 37a-47a.) Section 7 (Definitions) defines an EDU as "a unit of measurement that estimates an average use of wastewater facilities. Roughly the average amount of wastewater generated by a typical family in one day." (R.R. at 47a.)

Section 1.2 provides that "Tapping Fees are based on EDUs according to Section 2." (R.R. at 38a.) In Section 2, the 2015 Rate Resolution includes a section entitled, "Assignment of Equivalent Dwelling Units," listing different types of uses and assigning a number of EDUs per unit of measure for each type of improved property. (R.R. at 39a-41a.) For example, and pertinent to review of this case, the 2015 Rate Resolution provides that a single-family home is assigned a measure of one EDU; an apartment building is assigned one EDU per unit; a commercial office building is assigned "1 EDU per Business up to 10 employees"; and a "shell Building, per 3000 sq. ft." is assigned one EDU. (R.R. at 40a-41a.)

**Buchanan's Application for Permit to Connect to Sanitary Sewer**

On December 23, 2015, Buchanan submitted an "Application for Permit to Connect to [the Authority's] Sanitary Sewer System." (Amended Complaint, ¶8, R.R. at 33a.) The Authority was informed that there would be 40 employees in a space rented to Blue Mountain Quality Resources, and that there was a 9,238-square-foot space that had not yet been completed. Based on these assumptions, the Authority charged Buchanan a $32,977 tapping fee, computed as follows: $4,711 (which was the Capacity part of tapping as set forth in the 2015 Rate Resolution)[14] times 7 EDUs. In an email, the Authority explained that it charged Buchanan a tapping fee based on 7 EDUs, as follows:

---

[14] *See* R.R. at 38a.

11

Tom,

Based on the form you submitted, the EDU tapping fee assignment would be 7 EDUs.

The Blue Mountain Quality Resources section is based on the number of employees divided by 10, which is 4 EDUs.

The remainder of the building is calculated as a shell building, which is 1 EDU per 3,000 square feet, for 3 EDUs (9,238/3,000 = 3).

(Amended Complaint, ¶13, R.R. at 301a.)

Buchanan disagreed with the tapping fee, but paid it under protest and connected to the system.[15]  (Amended Complaint, ¶16.)

**Buchanan's Amended Complaint**

On August 6, 2018, Buchanan filed an amended class action complaint against the Authority.[16]  In Count I, Buchanan seeks a judicial declaration that the Authority's 2015 Rate Resolution and the tapping fees charged are not in accordance with the MAA.  Buchanan argues that the Authority's tapping fees "are not proportional to . . . the cost of [Buchanan Center's] 'design capacity requirements' for 'capacity part' and 'collection part' facilities in the [Authority's] system for [Buchanan Center] when compared to the overall system capacity."  Amended Complaint, ¶131.

---

[15]  Specifically, Buchanan objected to the Authority's EDU-method to charge Buchanan Center's tapping fee, arguing instead that its design capacity (i.e., its wastewater needs) should be based on its anticipated water usage, as determined by the State College Borough Water Authority. (Exhibit "D" to Amended Complaint, R.R. at 49a.)

[16] This is the operative complaint for purposes of this appeal.

Buchanan argues that the Authority's tapping fees "are improperly expressed as EDUs and are excessive, in violation of the express provisions of the MAA, as amended by Act 57 of 2003, specifically 53 Pa.C.S. §5607(d)(24)(i)(C)(I)-(II) and (VII)." *Id.* Buchanan argues that the Authority should be calculating tapping fees "on the basis of . . . anticipated or actual flow rates . . . as opposed to the arbitrary number of EDUs assessed." *Id.* ¶134. Buchanan alleges that State College Borough Water Authority estimated its water flow demand to be approximately 185 gallons per day. *Id.* ¶17. Buchanan alleges that, applying the methodology used by HRG in the 2005 Capital Charges Study, the Authority should have charged Buchanan a tapping fee of $3,651.90:

$19.74 (non-residential tapping fee per gallon) x 185 gallons per day = **$3,651.90**.

*Id.* ¶41.

Buchanan also seeks a declaration that the Authority's 2015 Rate Resolution is a legal nullity because the Authority failed to include a "detailed itemization" showing "the manner in which the fees were determined," as part of the Rate Resolution, in violation of the requirements of section 5607(d)(24)(ii) of the MAA, 53 Pa.C.S. §5607(d)(24)(ii). *Id.* ¶¶ 117, 115, 134.

In Count II, Buchanan seeks for itself, and on behalf of all class members, a refund of the difference between the alleged legally defective tapping fees imposed and the tapping fees that should have been imposed in conformity with the law. (Amended Complaint, ¶142.)

The Authority filed a preliminary objection to the Amended Complaint in the nature of a demurrer. The Authority argued that municipal authorities are, and have long been, authorized to "fix, alter, charge and collect rates and other charges" at "rates to be determined exclusively by it." (R.R. at 420a.) Citing *Patton-Ferguson Joint*

13

*Authority v. Hawbaker*, 322 A.2d 783 (Pa. Cmwlth. 1974) (upholding joint authority's rate schedule based on EDUs); *Curson v. West Conshohocken Municipal Authority*, 611 A.2d 775 (Pa. Cmwlth. 1992) (upholding decision of municipal authority to treat each separate unit in apartment building as separate EDU for purposes of charging building's owner a sewer tapping fee); and *Smith v. Athens Township Authority*, 685 A.2d 651 (Pa. Cmwlth. 1996) (upholding municipal sewer authority's charge of tapping fee for multi-unit trailer park on flat $600 per residence basis), the Authority asserted that our Court has, time and again, authorized municipal authorities to charge tapping fees on an EDU basis.

The Authority further argued that Act 57 did not alter the longstanding recognition that municipal authorities may charge fees and rates on an EDU basis. It relied on several cases, including *Chicora Commons Limited Partnership, LLP v. Chicora Borough Sewer Authority*, 922 A.2d 986 (Pa. Cmwlth. 2007) (upholding sewer authority's EDU classification system for rate structure), and *Peifer v. North Codorus Township Sewer Authority* (Pa. Cmwlth., Nos. 1407 C.D. 2009, 1408 C.D. 2009, filed May 21, 2010) (unreported) (upholding municipal authority's decision to charge mobile home park tapping fee on EDU basis instead of making an individual assessment of expected use), which were decided after the enactment of Act 57 and did not recognize any change in the law.

Next, the Authority argued that the MAA, as amended by Act 57, plainly does not change the way that tapping fees may be charged because it says nothing about any change to section 5607(d)(9) or municipal authorities' ability to charge tapping fees on an EDU basis. (R.R. at 423a.)

Regarding Buchanan's procedural challenge to the enactment of the 2015 Rate Resolution, the Authority argued that Buchanan's challenge was untimely because

14

Buchanan failed to contest the 2015 Rate Resolution within 30 days of its effective date in accordance with section 5571.1(b) of the Judicial Code, 42 Pa.C.S. §5571.1(b).[17] (R.R. at 424a-26a.)

On November 16, 2018, the trial court issued an opinion and order, sustaining in part, and denying in part, the Authority's demurrer. With respect to Buchanan's challenge to the Authority's method of charging tapping fees on an EDU basis, the trial court essentially adopted the Authority's position that Act 57 did not change the original intent of the MAA, which was to permit municipal authorities to charge fees and user rates on an EDU basis, as evidenced by this Court's 2007 decision in *Chicora*. (Trial ct. op., November 16, 2018, at 5.) The trial court further held that charging a tapping fee on an EDU basis is permissible if the EDU is applied in compliance with the "reasonable and uniform" requirements of section 5607(d)(9) of the MAA, 53 Pa.C.S. §5607(d)(9). *Id.* The trial court concluded that Buchanan failed to allege facts sufficient to support its claim that the Authority's assignment of seven

---

[17] Section 5571.1 of the Judicial Code provides, in pertinent part:

   (a) Applicability, court of common pleas.—

     (1) This section shall apply to any appeal raising questions relating to an alleged defect in the process of or procedure for enactment or adoption of any ordinance, resolution, map or similar action of a political subdivision.

         ***

   (b) Appeals of defects in statutory procedure.—

     (1) Any appeal raising questions relating to an alleged defect in statutory procedure shall be brought within 30 days of the intended effective date of the ordinance.

42 Pa.C.S. §5571.1.

15

EDUs to Buchanan Center was arbitrary. *Id.* at 6. Lastly, the trial court addressed Buchanan's procedural challenge to the 2015 Rate Resolution and the Authority's argument that the challenge was time-barred under section 5571.1 of the Judicial Code, 42 Pa.C.S. §5571.1. The trial court found that

> [t]he Rate Resolution permits tapping fees and lists the costs of the various components of the tapping fee by listing the cost per EDU. There are no allegations the [2005 Capital Charges] Study was not available for the public to inspect, or the resolution was passed without proper notice. Plaintiff challenges the failure to incorporate and attach the [2005 Capital Charges] Study into the rate resolution, despite the comprehensive breakdown of the individual portions of the tapping fee. The Rate Resolution strictly complies with the statutory requirements, is a valid ordinance, and is not void.

(Trial ct. op., November 16, 2018, at 7-8.)[18]

---

[18] The trial court agreed with the Authority that the time limitation in section 5571.1 of the Judicial Code, 42 Pa.C.S. §5571.1, was applicable to these circumstances. The trial court applied the burden of proof provisions of section 5571.1(e)(2) of the Judicial Code, 42 Pa.C.S. § 5571.1(e)(2) (which only apply when there is an exemption under section 5571.1(c) from the 30-day time limitation), and concluded that the 2015 Rate Resolution strictly complied with the requirements of section 5607(d)(24)(ii) of the MAA, 53 Pa.C.S. §5607(d)(24)(ii). This was in error because section 5571.1 of the Judicial Code, 42 Pa.C.S. §5571.1, applies to political subdivisions. This section specifically states: "This section shall apply to any appeal raising questions relating to an alleged defect in the process of or procedure for enactment or adoption of any ordinance, resolution, map or similar action of a political subdivision." The Authority is not a political subdivision. Section 1991 of the Statutory Construction Act of 1972 defines "political subdivision" as "[a]ny county, city, borough, incorporated town, township, school district, vocational school district and county institution district." 1 Pa.C.S. §1991. *See also Greer v. Metropolitan Hospital*, 341 A.2d 520, 527 (Pa. Super. 1975) ("[A] municipal authority is an entity distinct from both the Commonwealth and a political subdivision.").

That being said, the trial court's error is not a reversible one. In fact, because the trial court analyzed substantively whether the 2015 Rate Resolution violates section 5607(d)(24)(ii) of the MAA, 53 Pa.C.S. §5607(d)(24)(ii), and concluded that it did not, we are able to review Buchanan's second argument, discussed *infra*, that the trial court erred in finding the 2015 Rate Resolution to be valid and enforceable.

Although the trial court concluded that Buchanan's challenge to the *adoption* of the 2015 Rate Resolution was legally insufficient, it allowed Buchanan to file a second amended complaint to challenge to the Authority's *application* of the Rate Resolution. *Id.* at 8. However, Buchanan opted not to file a second amended complaint, and instead praeciped the trial court to dismiss the amended complaint with prejudice; thus, converting the November 16, 2018 order into a final appealable order. The trial court issued a certificate dismissing the amended complaint with prejudice on February 28, 2019.

On appeal, Buchanan argues that the trial court erred by: (1) holding that the Authority may charge its sewer tapping fee on the basis of assigning EDUs; (2) finding the Authority's 2015 Rate Resolution to be valid and enforceable; (3) relying upon "user rate" cases, and the general provisions of section 5607(d)(9) of the MAA, 53 Pa.C.S. §5607(d)(9), instead of the more recently enacted provisions of section 5607(d)(24), 53 Pa.C.S. §5607(d)(24), which deal specifically with tapping fees; and (4) finding the Authority's EDU-based sewer tapping fee to be valid, when no express language under section 5607 of the MAA, 53 Pa.C.S. §5607, authorizes EDU-based charges of any type.[19]

### *(1) Whether the trial court erred finding the Authority may Charge its Sewer Tapping Fee on the Basis of Assigning EDUs?*

In its first issue, Buchanan argues that the trial court erred as a matter of law and abused its discretion by holding that the Authority may charge tapping fees on the basis of assigning EDUs and by sustaining the Authority's demurrer on this issue.

___

[19] Both issues 3 and 4 are subsumed in our discussion of issue 1 and will not be addressed separately.

Buchanan contends that under the MAA, a new customer's tapping fee must be limited to the customer's proportionate gallons per day requirements (*i.e.*, its "Design Capacity"). (Buchanan's Br. at 33.) In support, Buchanan relies on section 5607(d)(24)(i)(C)(I) of the MAA, which provides in pertinent part: "[t]he capacity part of the tapping fee per unit of design capacity of said facilities required by the new customer shall not exceed the total cost of the facilities as described herein divided by the system design capacity of all such facilities." 53 Pa.C.S. §5607(d)(24)(i)(C)(I). Buchanan argues that this statutory language clearly limits the Capacity part of the tapping fee to a user's proportionate requirements for design capacity in such facilities when compared to the overall system design capacity of such facilities. Buchanan also relies on section 5607(d)(24)(i)(C)(II), which provides, "[t]he collection part of the tapping fee per unit of design capacity of said facilities required by the new customer shall not exceed the cost of the facilities divided by the design capacity." 53 Pa.C.S. §5607(d)(24)(i)(C)(II). Buchanan argues that this statutory language likewise "reflects a *pro rata* limitation that requires a user to pay for collection facilities only to the extent of his or her esoteric 'design capacity' requirements in such facilities, dividing the cost by the 'design capacity' of those overall facilities." (Buchanan's Br. at 45.)

Buchanan argues that the legislature "explicitly required an apples-to-apples comparison between a user's requirements for 'design capacity' and the overall 'system design capacity' by providing [in section 5607(d)(24)(i)(C)(VII)] that '[t]he units of measurement used to express design capacity shall be the same units of measurement used to express the system design capacity'" and specifically stating that "design capacity may not be expressed in terms of equivalent dwelling units." (Buchanan's Br. at 46) (citing 53 Pa.C.S. §5607(d)(24)(i)(C)(VII).) Buchanan contends that, despite this express language, the Authority charged its tapping fee on

18

an arbitrarily assigned EDU basis which has nothing to do with Buchanan's actual wastewater requirements. *Id.* at 47.

In considering a question of statutory construction, we are guided by the Statutory Construction Act. The object of statutory construction is to ascertain and effectuate legislative intent. Section 1921(a) of the Statutory Construction Act, 1 Pa.C.S. §1921(a); *Whitmoyer v. Workers' Compensation Appeal Board (Mountain Country Meats)*, 186 A.3d 947, 954 (Pa. 2018). In pursuing that end, we are mindful that a statute's plain language generally provides the best indication of legislative intent. *Whitmoyer*, 186 A.3d at 954; *Commonwealth v. McClintic*, 909 A.2d 1241, 1243 (Pa. 2006). Thus, statutory construction begins with examination of the text itself. *Southeastern Pennsylvania Transportation Authority v. Holmes*, 835 A.2d 851, 856 (Pa. Cmwlth. 2003), *appeal denied*, 848 A.2d 930 (Pa. 2004).

"[W]e are instructed to give the statute its obvious meaning whenever the language is clear and unambiguous." *Whitmoyer*, 186 A.3d at 954 (citing 1 Pa.C.S. §1921(b)). "To that end, we will construe words and phrases according to their common and approved usage." *Id.* (citing section 1903 of the Statutory Construction Act, 1 Pa.C.S. §1903(a)). "Further, every statute shall be construed, if possible, to give effect to all its provisions so that no provision is 'mere surplusage.'" *Id.* (citing 1 Pa.C.S. §1921(a)); *Malt Beverages Distributors Association v. Pennsylvania Liquor Control Board*, 918 A.2d 171, 175-76 (Pa. Cmwlth. 2007), *aff'd*, 974 A.2d 1144 (Pa. 2009). Moreover, we are to assume the General Assembly did not intend a result that is "absurd, impossible of execution or unreasonable." Section 1922(1) of the Statutory Construction Act, 1 Pa.C.S. §1922(1).

When there are conflicts between statutory provisions, we are mindful of the maxim that the particular controls the general:

19

> Whenever a general provision in a statute shall be in conflict with a special provision in the same or another statute, the two shall be construed, if possible, so that effect may be given to both. If the conflict between the two provisions is irreconcilable, the special provisions shall prevail and shall be construed as an exception to the general provision.

1 Pa.C.S. §1933. Further, whenever clauses within the same statute are irreconcilable, the clause last in order of date or position shall prevail. 1 Pa.C.S. §§1934, 1935.

Applying these canons, we conclude that the Authority charged Buchanan a tapping fee in a manner consistent with section 5607(d)(24) of the MAA, 53 Pa.C.S. §5607(d)(24). For one, section 5607(d)(24) of the MAA, as amended by Act 57, does not address how municipal authorities must, at the end of the day, charge an owner of a nonresidential property a tapping fee after calculating the Capacity and Collection parts.[20] It also does not, contrary to Buchanan's contention, require the authority to make individualized assessments of the expected use of each customer. Instead, the tapping fee provisions of the MAA at 53 Pa.C.S. §5607(d)(24)(i)(C) establish the guidelines and parameters a municipal authority must follow when calculating and recovering the **value** of its capital costs of providing the parts of the system required by the new user. The tapping fee provisions of the MAA ensure a new customer does not pay **more per unit than** what it cost the municipal authority per unit to provide its capacity and collection related services. In other words, the Capacity and Collection parts of the new customer's tapping fee **per unit** cannot be more than what it has **cost** the authority **per unit** to provide these services required by the new customer. 53 Pa.C.S. §5607(d)(24)(i)(C)(I) ("The capacity part of the tapping fee per unit of design

---

[20] The original Municipal Authorities Act of 1945 (MAA of 1945), Act of May 5, 1945, P.L. 382, *formerly* 53 P.S. §§301-322, repealed by the Act of June 19, 2001, P.L. 287, contained a provision for tapping fees. Act 203 of 1990 amended the MAA of 1945, to limit tapping and related fees such that a new customer would only pay for its fair share of the capital costs for including the new customer in the existing sewer system.

capacity of said facilities required by the new customer **shall not exceed** the total cost of the facilities as described herein divided by the system design capacity of all such facilities.") (emphasis added). 53 Pa.C.S. §5607(d)(24)(i)(C)(II) ("The distribution or collection part of the tapping fee per unit of design capacity of said facilities required by the new customer **shall not exceed** the cost of the facilities divided by the design capacity.") (emphasis added). The language of the MAA is crystal clear. We do not agree with Buchanan that these provisions reflect a mandatory *pro rata* limitation that requires a user to pay for collection facilities only to the extent of its esoteric design capacity requirements in such facilities. (Buchanan's Br. at 45.) That is not the import of this particular language, which is clearly to place a cap on the amount of the tapping fee an authority may collect from a new customer.

This is not to say that a new customer's design capacity is irrelevant. To calculate the Capacity and Collection parts of a tapping fee, it is necessary to identify the requirements of the new customer (its design capacity). *See West*, 661 A.2d at 464. But, the MAA does not require a tapping fee to be based on the exact number of units required by a new commercial customer, as suggested by Buchanan. According to Buchanan, the following language from the definition of "Design Capacity" evidences the legislature's intent that a tapping fee for a commercial user must be calculated, based on the customer's actual wastewater needs, as expressed on a per-gallon basis:

> The units of measurement to express design capacity **shall be the same units of measurement** used to express the system design capacity." This provision further states that "**design capacity may not be expressed in terms of equivalent dwelling units**.

53 Pa.C.S. §5607(d)(24)(i)(C)(VII) (emphasis added).

21

We do not agree with Buchanan that this language prohibits a municipal authority from charging a commercial customer's tapping fee on an EDU basis.[21] The MAA, as amended by Act 57, contains no such broad prohibitory language, and it is not for this Court to add, by interpretation, a requirement that the legislature did not see fit to include. *Commonwealth v. Rieck, Investment Corporation*, 213 A.2d 277, 282 (Pa. 1965). At first glance, the prohibition in section 5607(d)(24)(i)(C)(VII) of the MAA, 53 Pa.C.S. §5607(d)(24)(i)(C)(VII), against **expressing** design capacity in terms of EDUs, when read in isolation, could appear to prohibit **charging** tapping fees on an EDU basis. However, the provision must be read in context and together with the remaining language and construed with reference to the statute as a whole. *See Commonwealth v. Office of Open Records,* 103 A.3d 1276, 1285 (Pa. 2014). We conclude that, when read in context of the section in which it appears, the phrase "may not be expressed" in section 5607(d)(24)(i)(C)(VII) of the MAA, 53 Pa.C.S. §5607(d)(24)(i)(C)(VII), was intended to mean that design capacity may not be expressed in terms of EDUs **when determining the Capacity and Collection parts of the tapping fee**.

When determining the Capacity part of the tapping fee, a municipal authority's cost per unit is multiplied by the new customer's "required number of units of design capacity." (*See* Exhibit 3 to 2005 Capital Charges Study; R.R. at 70a.) Design capacity must obviously be expressed in some type of measurement or "**unit**." The disputed language simply requires that the **number of units of design capacity** in the calculation of the Capacity part (and Collection part) not be expressed in EDUs.

---

[21] *See Warwick Township Water & Sewer Authority v. Warwick Realty Co., L.P.*, 176 A.3d 387, 389 n.2 (Pa. Cmwlth. 2017) ("Pursuant to the Municipality Authorities Act, 53 Pa.C.S. §5601–5623, a municipal authority has the right to assess additional EDUs as water and sewer usage increases. *See* 53 Pa.C.S. §5607(d)(24)(i)(C)(I).").

This is because an artificially reduced tapping fee would result if the authority's costs per unit are multiplied **by EDUs**. And, if EDUs were used as the multiplier in the tapping fee equation, there would be no way to ensure that the new customer is not being charged more per unit than the authority's cost per unit of providing the required service.

We agree with Buchanan that the purpose of this language is to ensure apples are compared to apples. However, the problem with Buchanan's argument is that the Authority did not "express" Buchanan's design capacity in terms of EDUs **when calculating the Capacity part and Collection parts of the tapping fee**. If it had, the calculation for the Capacity part of the tapping fee would have been, as follows:

$15.50 (Authority's cost per gallon to provide capacity-related facilities) x 7 EDUs (No. of Units of Design Capacity) = $ 108.5

And, its calculation for the Collection part of the tapping fee would have been, as follows:

$4.24 (Authority's cost per gallon to provide collection-related facilities) x 7 EDUs (No. of Units of Design Capacity) = $63.60

By way of further example, in the 2005 Capital Charges Study, the Authority's cost per unit for capacity-related facilities was $15.50 per gallon per day. The Authority's cost per unit for Collection-related facilities was $4.94 per gallon per day. If these Costs per Unit ($15.50) and ($4.94) were multiplied by the number of EDUs (for example 1 EDU = a single-family home) instead of the maximum allowable design capacity of 90 gallons per day for a residence—the entire tapping fee for a single-family home would only be $15.50 + $4.94 = $19.74. The prohibition against

expressing design capacity in terms of EDUs **when calculating the Capacity part and the Collection part of the tapping** fee avoids this absurd result.

Alternatively, Buchanan argues that charging it a tapping fee based on "equivalent" units of residential discharge resulted in an arbitrary assessment that has no relation to its **actual** wastewater needs – which is contrary to the intent of the MAA. Buchanan argues that seven EDUs is an arbitrary number because Buchanan Center is projected by the State College Borough Water Authority to use just 185 gallons of water. (Exhibit "D" to Amended Complaint; R.R. at 49a.) Buchanan argues that, despite this projection, the Authority charged it seven times the residential tapping fee, despite the fact that its actual requirements for design capacity in the Authority's sewer system is less than that of a single residential property. (Buchanan's Reply Br. at 23.) Again, we must disagree.

An EDU assessment structure, while not based on actual wastewater flow rates, is not necessarily arbitrary. Here, the Authority's computation of EDUs was based upon the use of the single-family residence as the basic minimum unit of discharge. The EDU method of charging tapping fees employed by the Authority anticipates each commercial properties wastewater needs based on the type of building and the character of its use. After computing the component parts of the residential tapping fee in accordance with the MAA, the Authority assessed Buchanan Center at seven EDUs. In so doing, the Authority determined that a commercial office space with **40 employees** (using multiple restroom facilities) and a not-yet-developed 3,000-square-foot space, was the equivalent of seven single-family households consisting of 2.61 occupants each. (R.R. at 301a.) This determination was based on the Authority's 2015 Rate Resolution which, for a Commercial Office Building, assigned 1 EDU "per business up to ten employees, and 1 EDU per every 3,000 square feet of a 'Shell

24

Building,' a portion of a building that is not yet built out or occupied." (R.R. at 40a-41a.)

As the trial court observed, the MAA provides municipal authorities with significant discretion to impose fees and charges, including tapping fees, for the construction and maintenance of its facilities. *See Curson*, 611 A.2d at 777 (rejecting landowner's challenge to EDU-based connection fee on grounds that fee was not reasonable because it was not related to actual cost of connection); *see also Life Services, Inc. v. Chalfont–New Britain Township Joint Sewage Authority*, 528 A.2d 1038, 1041 (Pa. Cmwlth. 1987) (holding that a one-time contribution fee was reasonably related to the value of service rendered and that municipal authority's assumed use of 100 gallons per day per person was not arbitrary, and further observing that an authority is not required to establish its connection fee solely upon services actually consumed in order to be deemed reasonable). As the challenging party, the burden is on the challenger to show that the municipal authority abused its discretion or that the rate system or charge established is arbitrary or unreasonable. *Curson*, 611 A.2d 777.

In *Smith*, one issue before this Court was whether a municipal authority's charge of $600 tapping fee for each separate residence in a trailer park was reasonable. The owners of the trailer park argued that the authority should have only charged it one tapping fee of $1,600 for a commercial property, and that their tapping fee was not reasonable. 685 A.2d at 654, 657. In rejecting the owners' argument, we explained:

> [E]ven though the tap-in fee is not based on the actual cost of connection, this does not mean that the fee is arbitrary. There is nothing in the [*former*] Act which prevents the Authority from imposing a tap-in fee as a means of financing construction of the entire sewer system. *Curson* . . . . This

25

court has held that such a fee is an appropriate method for securing financing for the project. *Id.*

*Id.* at 657-58.

Moreover, the units of capacity required by a new customer must take into account the potential use or, as stated in *Life Services*, "the *value* of the service rendered either as actually consumed or as readily available for use." 528 A.2d at 1041 (emphasis in original).

Here, the Amended Complaint alleges that Buchanan's tapping fee was unreasonable because the Authority did not base it on its **actual water flow needs**. Buchanan alleged that its **water flow rate** for 2016-2017 was 191.78 gallons of water per day, and applying that figure, it should have been charged a tapping fee based on 1 EDU. *See* Amended Complaint, ¶¶41-43. However, Buchanan fails to allege any facts from which one can conclude that **water flow demand** is necessarily equal to the amount of **sewage generated**. As the Authority points out, "by using this estimate of future water usage, Buchanan's tapping fee for an (sic) 20,000 square foot building designed for approximately 40 employees would result in a tapping fee that is less than that for a single-family home." (Authority's Br. at 21-22.) Thus, the fact that the Authority did not charge Buchanan's tapping fee based on its **actual water flow needs** does not establish that the fee was unreasonable. Because the facts as alleged by Buchanan in its Amended Complaint do not establish that the Authority's tapping fee based on seven EDUs was unreasonable, we find the trial court did not err in dismissing Count 1 for failure to state a claim against the Authority.

*(2)    Whether the trial court erred finding the Authority's 2015 Rate Resolution to be valid and enforceable?*

26

Buchanan also seeks a declaration in Count I that the Authority's 2015 Rate Resolution was void *ab initio* because the Authority purportedly did not comply with section 5607(d)(24)(ii) of the MAA, which requires as follows:

> (ii) Every authority charging a tapping, customer facilities or connection fee shall do so only pursuant to a resolution adopted at a public meeting of the authority. The authority shall have available for public inspection a detailed itemization of all calculations, clearly showing the maximum fees allowable for each part of the tapping fee and the manner in which the fees were determined, which shall be made a part of any resolution imposing such fees. A tapping, customer facilities or connection fee may be revised and imposed upon those who subsequently connect to the system, subject to the provisions and limitations of the act.

53 Pa.C.S. §5607(d)(24)(ii).

Buchanan argues that because the Authority failed to make the 2005 Capital Charges Study a part of the Resolution, the Authority's 2015 Rate Resolution is not in conformity with the provisions of the MAA, and, therefore, it is a nullity.

Before a municipal authority can charge a tapping fee, section 5607(d)(24)(ii) of the MAA, 53 Pa.C.S. §5607(d)(24)(ii), requires it to adopt a resolution at a public meeting and to have available for public inspection a detailed itemization of all calculations, clearly showing the maximum fees allowable for each part of the tapping fee and the manner in which the fees were determined. *Id.* The purpose of the provision is to make sure the public has a basis upon which to evaluate the accuracy of a municipal authority's tapping fee.

In *Hidden Creek, L.P. v. Lower Salford Township Authority,* 129 A.3d 602 (Pa. Cmwlth. 2015), this Court addressed section 5607(d)(24)(ii) of the MAA, 53 Pa.C.S. §5607(d)(24)(ii), in the context of determining whether the developer's

27

challenge to the amount of the tapping fee was barred by the two-year statute of limitations, which ran from the time the fee was paid. There, the developer raised the discovery rule and argued that it had no reason to know that the tapping fees were calculated erroneously because Lower Salford Township Authority's (LSTA) rate resolutions did not provide enough detail that would enable it to identify the errors in LSTA's tapping fee calculations. LSTA's 1998 rate resolution provided:

> WHEREAS, [Engineer] has performed a study to determine the appropriate amount that the [LTSA] may charge as a tapping fee; and
>
> WHEREAS, the results of the Engineer's study indicated that the Authority could charge a tapping fee in excess of Seven Thousand Dollars ($7,000.00); and
>
> WHEREAS, the [LTSA] is desirous of increasing its tapping fee but does not desire to charge the maximum fee permissible; and
>
> WHEREAS, the [LTSA], upon the proper motion and second, adopted an increase in tapping fees at its December 11, 1997 meeting.
>
> NOW, THEREFORE, be it resolved and it is hereby resolved as follows:
>
> 1. [LTSA] hereby adopts Engineer's Act 203 study dated November, 1997 as a basis for calculating its tapping fees.
>
> 2. [LTSA] hereby establishes its tapping fee at Six Thousand Eight Hundred and Seventy-five Dollars ($6,875.00), effective December 11, 1997.
>
> 3. All other resolutions inconsistent herewith are deemed rescinded.

LSTA's 1999 rate resolution provided:

WHEREAS, [Engineer] has performed a study to determine the appropriate amount that the [LTSA] may charge as a tapping fee; and

WHEREAS, the results of the Engineer's study indicated that the Authority could charge a tapping fee in excess of Seven Thousand Dollars ($7,000.00); and

WHEREAS, the [LTSA] is desirous of increasing its tapping fee but does not desire to charge the maximum fee permissible; and

WHEREAS, the [LTSA], upon the proper motion and second, adopted an increase in tapping fees at its December 21, 1999 meeting.

NOW, THEREFORE, be it resolved and it is hereby resolves as follows:

1. [LTSA] hereby adopts Engineer's Act 203 study dated December, 1999 as a basis for calculating its tapping fees.

2. [LTSA] hereby establishes its tapping fee at Seven Thousand Dollars ($7,000.00), effective January 1, 2000.

3. All other resolutions inconsistent herewith are deemed rescinded.

*Hidden Creek*, 129 A.3d at 608-09.

In *Hidden Creek*, we concluded that the rate resolutions did not provide any basis for the public to evaluate the accuracy of LSTA's tapping fees because the components providing the basis for the tapping fee were not separately set forth in the rate resolutions or the engineering studies attached to the rate resolutions. *Id.* at 609.

The facts in *Hidden Creek* are distinguishable. There, the resolutions merely made reference to engineering studies which were not attached to the resolutions, and referenced the tapping fee without identifying the component parts thereof. Here, unlike in *Hidden Creek*, the 2015 Rate Resolution, *inter alia*, set forth the Capacity component as $4,711 per EDU and explained that "Tapping fees are based on EDUs according to Section 2." (R.R. at 38a.) Section 2.4, in turn, titled "Assignment of Equivalent Dwelling Units," states that "[a]n Equivalent Dwelling Unit EDU shall apply to each classification of connection as follows" and lists the following classifications: (a) Residential; (b) Commercial; (c) Industrial and Commercial; (d) Public; and (e) Miscellaneous. (R.R. at 39a-41a.)

Further, Buchanan has not alleged any facts to support a claim that the Authority either failed to adopt the 2015 Rate Resolution at a public meeting or that it failed to make available for public inspection a detailed itemization of all calculations, clearly showing the maximum fees allowable for each part of the tapping fee and the manner in which the fees were determined (*i.e.*, the 2005 Capital Charges Study). By all accounts, the original 2005 Capital Charges Study was duly adopted pursuant to Act 57, and sets forth the separate capacity and collection components of the tapping fees in total compliance with the MAA. The 2005 Capital Charges Study referenced the calculations required by the MAA for establishing the different components for tapping fees, represented that such calculations were performed, and attached copies of the calculations. Further, it is clear from the 2015 Rate Resolution that it is a "revised" rate resolution, *i.e.,* it revised something that was done previously. According to the Amended Complaint, this was the 2005 Capital Charges Study. Thus, by implication, the 2015 Rate Resolution included the 2005 Capital Charges Study which it amended, and which Buchanan does not allege was either not duly adopted or not available for

30

public inspection. Finally, a review of the revised 2015 Rate Resolution establishes that it set forth the Capacity and multiple Collection components of the tapping fee, and clearly explained that tapping fees are based on EDUs as set forth in a schedule containing over 20 categories of commercial properties, like restaurants, automobile dealers, beauty and barber shops, bed and breakfasts, bowling alleys, car washes, laundromats, retail food stores, retirement homes, hotels, and office buildings. (R.R. at 38a-41a.)

The purpose of section 5607(d)(24)(ii), 53 Pa.C.S. §5607(d)(24)(ii), is to ensure that the public has a basis to evaluate the accuracy of the tapping fees and that was accomplished here. Unlike in *Hidden Creek*, the 2015 Rate Resolution, together with the information available for inspection at the Authority, provided the public with a sufficient basis to evaluate the accuracy of the Authority's tapping fees.

For all of the foregoing reasons, the trial court's order is affirmed.

_____
PATRICIA A. McCULLOUGH, Judge

Judge Cohn Jubelirer did not participate in this decision.

31

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

J. Buchanan Associates, LLC,     :
           Appellant     :
                         :   No.  261 C.D. 2019
           v.            :
                         :
University Area Joint Authority     :

## ***ORDER***

AND NOW, this 13th day of May, 2020, the February 28, 2019 order of the Court of Common Pleas of Centre County is hereby affirmed.

_____
PATRICIA A. McCULLOUGH, Judge